280 N.J. Super. 304 (1994)
654 A.2d 1381
STATE OF NEW JERSEY, PLAINTIFF,
v.
MICHAEL R. IMBRIANI, DEFENDANT.
Superior Court of New Jersey, Law Division Mercer County.
Decided November 30, 1994.
*305 Nancy L. Singer, Assistant Attorney General, for plaintiff.
Donald R. Belsole, for defendant.
LENOX, J.S.C.
This is an appeal by defendant, Michael R. Imbriani, from a rejection by the Program Director of his application for entry into the Mercer County Pretrial Intervention Program. Defendant, by written waiver of indictment, consented to prosecution under an accusation charging him with one count of theft by failure to make required disposition of property received, contrary to N.J.S.A. 2C:20-9, over a five-year period ending in 1992. After negotiation with the Office of the Attorney General, Division of Criminal Justice, defendant entered a plea of guilty under an agreement requiring him to make restitution; to pay approximately $173,002, of which $85,000 has been paid; to pay $5,314 in unpaid taxes to the State of New Jersey; and to perform 300 hours of community service. The Attorney General agreed that defendant could apply to the Pretrial Intervention Program, and that no objection would be made if the Program Director recommended the defendant for admission. The underlying facts are fully set forth in the Director's report and need not be repeated here.
A preliminary issue arose at oral argument of the appeal due to certain positions taken by the Attorney General at different stages of the proceedings. As a part of the negotiated plea, the Attorney General agreed not to oppose the pretrial intervention application. Following the Program Director's rejection and defendant's appeal, the Attorney General initially determined to take no position. *306 The court, however, requested that the Attorney General either consent to or oppose defendant's appeal because of the resulting difference in the applicable standard for review. The Attorney General then objected to defendant's entry into the program and filed a brief in opposition. Defendant has argued that this was a change of position that violated the recorded plea agreement; whereas, the Attorney General has asserted that there is no inconsistency. The Attorney General's refusal to consent, if well taken, gives rise to a review standard of patent and gross abuse of discretion which is most difficult to establish. It is unnecessary to plunge into this thorny thicket as the determination of this motion would be the same under the more liberal standard applicable to cases in which the state consents.
Defendant's burden on this appeal is well settled. Guideline 8 of the Guidelines for Operation of Pretrial Intervention in New Jersey, approved for implementation by the Supreme Court pursuant to R. 3:28, amended effective December 1, 1982, provides, in pertinent part:
The challenge is to be based upon alleged arbitrary or capricious action, and the defendant has the burden of showing that the Program Director or Prosecutor abused his discretion in processing the application.
[Id.]
The record establishes no arbitrary action on the part of the Program Director which would constitute an abuse of the discretion vested in him.
In rejecting defendant's application for pretrial diversion, the Program Director's report relies upon the policy guidelines found in N.J.S.A. 2C:43-12, which he identified as subsections (a) 1, 2 and 3; (b); and (e) 1, 2, 7, 8, 14 and 17. However, in addition to the statutory guidelines referenced by the Director, the Supreme Court, by amended Order effective December 1, 1982, approved implementation of additional criteria in Guidelines for Operation of Pretrial Intervention in New Jersey. Guideline 3 thereof provides that consideration shall be given to "other relevant circumstances," including that in Guideline 3(i)(4) which reads:

*307 If the crime was ... a breach of the public trust where admission to a PTI program would deprecate the seriousness of defendant's crime, the defendant's application should generally be rejected.
[Id.]
The Program Director neither relied upon nor mentioned a breach of the public trust as a ground for his decision. This is understandable in view of the dearth of New Jersey authority to support such a basis. Research has disclosed no reported decision in this State addressing the question of whether criminal activity committed by a judge other than during or related to the performance of his judicial duties, constitutes a breach of the public trust. This opinion decides that it does, and holds that defendant's criminal conduct in his personal affairs constituted a breach of the public trust and that his admission to a PTI program would deprecate the seriousness of his crime. The Code of Judicial Conduct and cases in other jurisdictions provide support for that conclusion.
What must be recognized, as it is of paramount significance, is that defendant was not an ordinary citizen. He was a Judge of the Superior Court, one to whom the citizens of New Jersey look for the highest level of honesty and integrity. It is true, as defendant argues, that his criminal conduct was unrelated to his performance of his judicial duties which at all times was exemplary. That fact does little to satisfy the public concern that one entrusted with the high obligation of determining the rights and liabilities of the citizenry, himself engaged in a long course of breach of trust and criminal conduct. One need look only to the Code of Judicial Conduct to learn that although committed in his private life, defendant's activities violated the obligations of the office he held.
Canon 1 of the Code recites that:
An independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining and enforcing, and should personally observe, high standards of conduct so that the integrity and independence of the judiciary may be preserved.
[Code of Judicial Conduct Canon 1 (1994).]
*308 To that end, Canon 2(A) of the Code requires a judge to "respect and comply with the law and ... act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary." These canons emphasize that the confidence of the people in the judicial branch of government may be shattered by the realization that a judge in whom the Governor and the Senate have placed the enormous responsibility of that office is himself a criminal. Testimony to this is found in the commentary to Canon 2 of the Code which explains that:
Public confidence in the judiciary is eroded by irresponsible or improper conduct of judges. A judge must avoid all impropriety and appearance of impropriety, and must expect to be the subject of constant public scrutiny. A judge must therefore accept restrictions on personal conduct that might be viewed as burdensome by the ordinary citizen and should do so freely and willingly.
The standard of conduct required of a judge is but a recognition of the public expectation as to those who occupy judicial office. The public trust imposed upon a judge encompasses an obligation of comportment as a law abiding citizen. This thought is reflected in a speech by John F. Kennedy, to the Massachusetts State Legislature on January 9, 1961:
For those to whom much is given, much is required. And when at some future date the high court of history sits in judgment on each of us, recording whether in our brief span of service we fulfilled our responsibilities to the state, our success or failure, in whatever office we hold, will be measured by four questions: First, were we truly men of courage? Second, were we truly men of judgment? Third, were we truly men of integrity? Finally, were we truly men of dedication?
[In re Commission on Judicial Tenure and Discipline Proceedings against Justice Antonio S. Almeida, 611 A.2d 1375, 1389 (R.I. 1992).]
In the absence of guiding case law in New Jersey, reference to the decisions of other jurisdictions is appropriate. The Texas Supreme Court has held that criminal misconduct by a judge in his personal affairs constitutes a breach of the public trust. See In re O.P. Carrillo, District Judge, 542 S.W.2d 105 (Tx. 1976). In that removal proceeding, the court was presented with various acts of misconduct by the judge. He defended on the ground that the action against him was without merit, as none of the alleged misconduct related to the discharge of his judicial duties. While in removing the judge from office, the court did not specifically *309 refer to a breach of the public trust, the ruling shows that intention. The court stated:
It is entirely possible for the personal conduct of a judge while he is off the bench to be so willful, intemperate, or dishonest as to cause public disrespect for the office and the judiciary in general. It is wise that Section 1(a) of Article 5 holds a judge accountable for both his private and his judicial conduct whenever either are so willful or persistent as to cast public discredit upon the judiciary or the administration of justice.
[Id. at 111.]
It is noteworthy that the court found this standard to be so important that it was applicable to crimes committed prior to assuming the judicial office.
We hold that non-judicial acts, including misconduct committed but unknown to the public before a judge is elected to office, may be willful or persistent so as to cast public discredit upon the judiciary or administration of justice and serve as grounds for removal under this type of proceeding. The conduct constituting grounds for removal under Section 1(a) of Article V is not limited to judicial acts or acts performed during the term of office for which the judge is elected.
[Ibid.]
The court found authority for this conclusion in decisions from California and Louisiana:
In Geiler v. Commission on Judicial Qualifications, 10 Cal.3d. 270, 110 Cal. Rptr. 201, 515 P.2d 1 (1973), much of the conduct of the judge under scrutiny related to vulgar and indecent language on his part, which took place at a time when he was not engaged in presiding over his court. The California Supreme Court described "prejudicial conduct" as including "willful misconduct out of office, i.e. unjudicial conduct committed in bad faith by a judge not then acting in a judicial capacity."
The Supreme Court of Louisiana concluded that charges relating to personal non-judicial conduct warranted removal of a judge under provisions of the Louisiana constitution. In re Haggerty, 257 La. 1, 241 So.2d. 469 (1970). Although all of the alleged misconduct occurred in a private capacity, the Louisiana Supreme Court said that the public has a "deep and vital interest" in the "office of judge." .. . "The official conduct of judges, as well as their private conduct, is closely observed when a judge, either in his official capacity or as a private citizen, is guilty of such conduct as to cause others to question his character and morals, the people not only lose respect for him as a man but lose respect for the court over which he presides as well."
[Ibid.]
In the Haggerty case, the conduct of the judge was found to involve: consorting "with public gamblers and criminal characters;" engaging "in heavy, habitual drinking in public;" promoting *310 and "being a part of a scandalous and sordid party in the company of prostitutes ...;" and engaging in "fisticuffs with arresting officers...." 241 So.2d 469, 478-79 (La. 1970). Removing the judge from office, the court stated that the "off-bench behavior of a judge should not only be above reproach but such as to inspire confidence of the public in the judiciary." Ibid.
Furthermore, in Stanley v. Jones, 201 La. 549, 9 So.2d 678 (1942), a judicial-removal proceeding for gross misconduct off the bench, the court wrote to the same effect:
The office of judge is one in which the general public has a deep and vital interest, and, because that is true, the official conduct of judges, as well as their private conduct, is closely observed. When a judge, either in his official capacity or as a private citizen, is guilty of such conduct as to cause others to question his character and morals, the people not only lose respect for him as a man but lose respect for the court over which he presides as well.
[Id., 9 So.2d at 683.]
Other cases, although involving misconduct in the performance of judicial duties, also refer to the obligation of a judge in the conduct of his personal affairs. For example, in In re Commission on Judicial Tenure and Discipline Proceedings against Justice Antonio S. Almeida, supra, the court concluded that:
[J]udges especially are to be held to a higher standard of conduct, thereby embodying ethics, integrity and honesty. This court must attempt to correct the wrongs, to prevent future abuses, and to restore public trust and faith in a judicial system that prior to this time has remained unscathed for over 300 years. In doing so we must address petitioner's conduct in the light of his position of a judge.
[611 A.2d at 1389.]
See also Merckle v. Florida, 529 So.2d 269 (Fla. 1988) (a judge is, therefore, by the position of his office different. No other public servants are subject to as stringent a Code of Ethics as are judges).
Further indication that it is not inappropriate to equate the criminal conduct of a judge in his personal affairs with such conduct in the performance of his judicial duties may be seen in State v. Markt, 156 N.J. Super. 486, 384 A.2d 162 (App.Div. 1978). The case will be familiar to defendant's counsel as he argued it before the Appellate Division. There are marked similarities in *311 the facts of that case to those at bar. Defendant, Markt, was charged with crimes involving breach of the public trust. While the treasurer of the Joint Free Public Library of Morristown and Morris County, he embezzled money from the library and drew several checks to himself as payee, forging thereon the signature of another library official. The similarity in the conduct of defendant and Markt is obvious. Although defendant did not commit his crimes during the course of his employment, the public's faith and trust placed in one chosen to be their judge is surely greater with regard to honesty in his private affairs, than is that same trust placed in the treasurer of a municipal library in the performance of his public duty.
The amount of the monies received by Markt through his embezzlements and forgeries is not disclosed in the opinion, but, considering the circumstances, it is unlikely that it equaled or exceeded that unlawfully received by defendant. The court in Markt recognized the conduct to be of a continuing nature, the time being less than a year, compared with five years in the case of defendant. There was no question of Markt's amenability to the rehabilitative process through the pretrial diversion. The Program Director recommended admission, but the Prosecutor withheld consent. The Appellate Division noted that:
"[T]he Prosecutor's reasons for his adverse decision... were within the ambit of Supreme Court Guidelines 3(i), which recommends that a defendant's application should generally be rejected where the crime, among others, was "(2) part of a continuing criminal business of enterprise," or ... "(4) a breach of the public trust where admission to a PTI Program would deprecate the seriousness of defendant's crime."'"
[Markt, supra, 156 N.J. Super. at 492, 384 A.2d 162.]
The Appellate Division affirmed the trial court's denial of Markt's application for admission into the program, commenting with regard to his arguments for admission:
While they constitute an eloquent plea for leniency, they deal largely for his potential for rehabilitation, which is not disputed. But they gloss over the plain fact that defendant was guilty of a breach of public trust by the commission not *312 merely of a single criminal act, but of a series of embezzlements and forgeries extending over a period of months. On this ground the court concluded that defendant had not carried the heavy burden of showing a patent and gross abuse of discretion.
[Id.]
The same may be said of defendant. As a judge his conduct must be above reproach. So important in our society is the strict standard of conduct required of judges, that they may not engage in many forms of lawful and honorable political and charitable activity of the highest level in order to protect against even an inference of impropriety or conflict of interest. The criminal nature of defendant's activities aside, his financial and business dealings demonstrate a disregard on his part for the obligations of a judge under Canons 5(C), 5(D) and 6. His egregious conduct and the continuing nature thereof over a period of five years clearly constitutes a breach of the public trust and must be accepted as such on this application.
While a breach of the public trust under Guideline 3(i)(4) was not utilized by the Program Director in his report rejecting defendant's application for admission into the program, the Director did consider the fact that defendant was a judge at the time of the commission of the offense. Defendant has argued that all applicants for pretrial intervention must be treated equally, that the court may not sanction ad hoc or arbitrary determinations, and that this defendant should be evaluated by the Director not as a judge, but as any other citizen not holding that title would be considered. See State v. Leonardis, 71 N.J. 85, 363 A.2d 321 (1976). Defendant is, indeed, entitled to equal treatment on his application for admission, but his status as a judge is not only a valid factor for consideration, it is a significant one.
Such consideration is similar to that given to the status of two public school teachers applying for pretrial intervention who knowingly received stolen goods from a student. See State v. Hermann, 80 N.J. 122, 402 A.2d 236 (1979). In State v. Humphreys, 89 N.J. 4, 444 A.2d 569 (1982), the Supreme Court commented further on Hermann, observing that while the "special *313 trust imposed in them as school teachers was a matter for consideration, it was not a litmus test for denial of admission into a pretrial intervention program." Id. at 12, 444 A.2d 569. Humphreys involved an application for a Conditional Discharge under N.J.S.A. 24:21-27, following his arrest for possession of marijuana and hashish during the execution of a search warrant at his home. The Supreme Court held that "[p]art of the whole person or character of the defendant as the judge saw it could well include the involvement of Humphreys with a recent pupil, ... and Humphreys' role model status as a teacher." Cf. State v. DeMarco, 107 N.J. 562, 527 A.2d 417 (1987) (involving an off-duty police officer charged with assault upon a citizen).
By perpetrating his admitted theft, defendant was not acting merely as an ordinary citizen and cannot be taken as such for the purpose of determining whether he should be accepted or rejected into the program. He was and knew he was one entrusted with the high obligation of public service requiring extreme circumspection in both his public and private life. The guidelines cited by the Director recognize this in including for consideration in formulating a recommendation "the needs and interests of ... society;" "the public need for prosecution;" and "the harm done to society by abandoning criminal prosecution...." Above all of the legitimate factors weighing upon the Program Director's decision must be the universal public concern over the character and integrity of those who occupy the judicial bench. Anything which erodes that confidence is a matter of concern not only to the public but to the judicial system, and is a legitimate factor for consideration in a case of this nature. That was recognized by the Supreme Court in State v. Sutton, 80 N.J. 110, 402 A.2d 230 (1979), in holding that "[a]lso relevant are some `subjective' evaluations, such as ... the degree of local public anxiety attaching to certain forms of misconduct." Id. at 119, 402 A.2d 230; see also State v. Cucinotta, 206 N.J. Super. 261, 270, 502 A.2d 89 (Law Div. 1984). As stated by our Supreme Court in In re Yaccarino, 101 N.J. 342, 502 A.2d 3 (1985), which involved non-criminal ethical impropriety of a judge *314 implicating his judicial duties, as opposed to the criminal conduct of a judge in his personal affairs:
[T]his conduct ... reflects adversely upon the office of the judge and the administration of justice and brings the judiciary into public disrepute. We therefore conclude that respondent violated Canons 1 and 2 of the Code of Judicial Conduct.
[Id. at 363, 502 A.2d 3.]
It is clear that the conduct of a judge need not occur during the course of his performance of his judicial duties to cause damage to the integrity of the judicial process. Call it public interest, public vindication or public disgust, it cannot be denied that when a public official who enjoys the honor, dignity and esteem essential to the maintenance of an effective judiciary in a free society violates the confidence placed in him, that factor is an important, indeed a predominant one, for consideration by the Program Director. Needless to say, it must be balanced against defendant's otherwise exemplary judicial service, his long work in the cause of justice as a deputy attorney general and prosecutor, his educational accomplishments, his dedication to his community and his family and the absence of a prior criminal record. It cannot be said, however, that those factors necessarily outweigh the societal interests in the prosecution of criminal charges against a judge.
The New Jersey Legislature has enumerated seventeen factors for consideration in evaluating an application for admission into a PTI program. See N.J.S.A. 2C:43-12e(5). However, those listed are inclusive, not exclusive, for the statute states that they are criteria to be considered "among other things." As Judge Long explained in State v. Pickett, 186 N.J. Super. 599, 453 A.2d 291 (Law Div. 1982), "neither these criteria nor others set forth in the statute are exhaustive or dispositive." Id. at 604, 453 A.2d 291. Her explanation as to how an application must be evaluated is instructive:
[N]otwithstanding any facts in an applicant's record which ordinarily would lead to exclusion, he should be permitted to present to the director factors tending to demonstrate his amenability to rehabilitation, showing compelling reasons justifying his admission or establishing that a decision against his enrollment would be arbitrary and unreasonable. Guideline 2. It is the director's responsibility to *315 carefully weigh all of the objective data available in connection with an applicant so as to make the necessarily subjective judgment about his character and potential for rehabilitation which undergirds any decision to accept or reject him. This analysis is much like that which is made in connection with sentencing, where the so-called whole man is evaluated by the court in order to arrive at an appropriate disposition. State v. Phillips, 176 N.J. Super. 495, 423 A.2d 1008 (App.Div. 1980).
[Ibid.]
In his report rejecting defendant's application the Program Director referenced six of the seventeen factors as a basis for his decision, numbered in the statute as follows:
(1) The nature of the offense;
(2) The facts of the case;
....
(7) The needs and interests of the victim and society;
(8) The extent to which the applicant's crime constitutes part of a continuing pattern of anti-social behavior;
....
(14) Whether or not the crime is of such a nature that the value of supervisory treatment would be outweighed by the public need for prosecution; and
....
(17) Whether or not the harm done to society by abandoning criminal prosecution would outweigh the benefits to society from channeling an offender into a Supervisory Treatment Program.
On this appeal, defendant urges that inadequate weight was given by the Program Director to the fact that the crime charged in the accusation is a third degree offense under the Code of Criminal Justice. Under Guideline 3(i) of R. 3:28, it is provided that "[a] defendant charged with a first or second degree offense ... should ordinarily not be considered for enrollment in a PTI program except on joint application by the defendant and the prosecutor." While it is so that the accusation charges defendant with a single count of violation of N.J.S.A. 2C:20-9 (theft by failure to make required disposition of property received), and alleges a theft of less than $75,000 which constitutes a crime of the third degree under N.J.S.A. 2C:20-2b(2)(a), such a limited view of defendant's criminal conduct is unwarranted. The charge in the accusation of only a third degree offense is, by defendant's own admission, inconsistent with and less egregious than what actually *316 occurred. The accusation was filed on the basis of a negotiated agreement with the Office of the Attorney General, calling for a plea of guilty by defendant in return for a non-custodial sentence and reduction in the number and severity of the offenses which the evidence might support. The Program Director is not limited in evaluating defendant's application for pretrial intervention to consideration of the criminal conduct as a single offense and one of the third degree. He may look beyond the plea to the actual facts when they are not in dispute, as it is the conduct not the charge which governs. Surely, it could not be legitimately argued, for instance, that an applicant for pretrial intervention who had committed multiple offenses over a period of years, but reached an agreement with the prosecutor to plead guilty to one count in return for dismissal of the remainder, would be entitled to the same consideration as one whose single offense was an aberration in an otherwise exemplary life.
The Program Director appropriately stated that he considered that the nature of the offense is more serious than that charged in the accusation. The funds which defendant diverted to his own use totaled $173,002, more than double the amount required to constitute a crime of the second degree. The true amount may have been much larger but was limited by the statute of limitations. The diversion of funds took place for more than five years, involved innumerable deliberate unlawful acts and took diverse and ingenious forms. The primary diversion in the amount of $113,576.53 was accomplished by the deposit of checks from tenants for rent and real estate taxes payable to the order of Community Medical Arts Building, Inc. into his personal bank account. This occurred over a period of four years, and it is apparent that for these checks to reach this high total a continuous course of diversion had to have occurred. An additional $26,300.35 was unlawfully obtained by writing checks from the corporate bank account in payment of his personal taxes, utilities, insurance, mortgage and other expenses. Further, funds totaling $32,050.05 were obtained through another and more sinister scheme. Defendant falsely wrote checks to existing businesses *317 who supposedly provided materials or services to the corporation, forged the vendors' names and cashed the checks. The final diversion of $16,361.19 took an even different form. A stock brokerage account was opened in the name of the corporation and shares of bank stock in the corporate name were deposited with the brokerage. The account had check writing privileges and over a four year period defendant received funds from the account through checks written to himself and cashed by him or deposited in his own bank account.
The magnitude, scope and length of this criminal conduct is such that the Program Director was entirely justified in placing upon it the weight which he did. As a Guideline factor, this presents an overwhelming picture of an applicant for pretrial diversion who knowingly, unlawfully, and continuously for many years converted to his own use money to which he was not entitled. It is so, as was argued by defendant citing State v. Marie, 200 N.J. Super. 424, 491 A.2d 784 (Law Div. 1984), that a continuing criminal enterprise does not always present a difficult barrier for an applicant to surmount. Under the circumstances of this case, however, the Director could reasonably find that the nature of the offense and the public interest previously discussed "outweigh the benefits to society from channeling this" offender into a supervisory treatment program. N.J.S.A. 2C:43-12e(17).
Defendant's crime fell within the ambit of Guideline 3(i) as constituting a continuing criminal enterprise, and thus generally constitutes sufficient justification for rejection from pretrial intervention. See State v. Sutton, 80 N.J. 110, 117-18, 402 A.2d 230 (1979). However, it must be measured according to defendant's amenability to correction and responsiveness to rehabilitation, as well as by the nature of the offense involved. See State v. Leonardis, supra, 71 N.J. 85, 363 A.2d 321 (Leonardis I). Former Assignment Judge Haines observed that six reported decisions had addressed the question of what constituted "a continuing criminal business or enterprise," as referred to in Guideline 3(i), *318 without having provided a definition thereof. He undertook to do so in State v. Marie, supra, holding that:
[T]he Guidelines intend a "continuing criminal enterprise" to consist of a course of conduct involving a series of transactions continuing over a period of time. It is a defendant's repetitive criminal activities which provide a negative implication when rehabilitation is considered. That implication is not present when a single transaction is involved; even though, before it runs its course, it may provoke a chain of events.
[200 N.J. Super. at 429, 491 A.2d 784.]
This explanation demonstrates the validity of one of the reasons the Program Director found to deny defendant's application. Defendant began his course of conduct five years or more before the illegal nature thereof was discovered by his victims. Whether the conduct occurred on a daily, weekly, monthly or some other basis, it is clear that every day during that five-year period he knew that he had performed and was continuing to perform illegal acts and was receiving monies to which he was not entitled. Each new act of misappropriation confirmed those which had preceded it, and demonstrated the absence of remorse, the unlawful intent, and his belief that he could continue to do so with impunity because his victims had exhibited their trust and confidence in his management of their affairs. Had defendant not permitted a mortgage to go into default alerting his victims to the situation, he might well have been continuing his conduct to this day. The Program Director had every reason to conclude that this scenario renders defendant a poor candidate for rehabilitation.
Defendant has criticized the weight given by the Director to the objection by the victims of defendant's unlawful conduct to his entry into the program. The Program Director interviewed the victims, stated the basis of their opposition in his rejection and properly included it in his deliberative process. "This is a factor which must be considered." State v. Ridgway, 208 N.J. Super. 118, 127, 504 A.2d 1241 (Law Div. 1985); see also State v. Poinsett, 206 N.J. Super. 307, 312-13, 502 A.2d 578 (Law Div. 1984). Such consideration in no way alters the overriding emphasis "on the individual offender and his potential for rehabilitation," State v. Lamphere, 159 N.J.Super 562, 565, 388 A.2d 998 (App.Div. 1978). *319 It is simply yet another factor for inclusion in the balancing process. The report does not support a conclusion that undue weight was given to this aspect.
Following a thorough investigation, the Program Director rendered a comprehensive and thoughtful evaluation of defendant's application for admission into the pretrial intervention program. Defendant has failed to carry his heavy burden of establishing that the Director's denial of the application constituted arbitrary or capricious action and an abuse of the discretion committed to him. The New Jersey Supreme Court held in State v. Bender, 80 N.J. 84, 93, 402 A.2d 217 (1979), that defendant must show that the denial was not premised upon a consideration of all relevant factors, was based upon a consideration of irrelevant or inappropriate factors, or amounted to a clear error in judgment. He has not done so.
The Director's rejection report concluded with the following summary of his evaluation:
In sum, this office takes the position that this case/defendant is not appropriate for disposition through PTI. The amount of the theft is too large, the time period over which this occurred is too long, the criminal practices too diverse, and the victims too aggrieved. The acts were purposeful and executed through careful planning, with the defendant realizing considerable financial gain. Although the applicant brings unique, if not remarkable, credentials, and certainly expresses an ostensible desire for diversion, his conduct through the lengthy course of crime, and afterwards, profiles an attitude less than ideal for diversionary supervision.
The Director analyzed the various relevant factors in light of defendant's amenability to correction, potential for rehabilitation and the nature of the offense. His conclusion was an appropriate one. Accordingly, the appeal is denied.