694 A.2d 1030

IN THE MATTER OF MICHAEL R. IMBRIANI,
AN ATTORNEY AT LAW.

Argued April 29, 1997—Decided June 27, 1997.

*Richard J. Engelhardt*, Assistant Ethics Counsel, argued the cause on behalf of the Office of Attorney Ethics.

*Mark D. Imbriani* argued the cause for respondent.

PER CURIAM.

This disciplinary proceeding arises from a motion filed by the Office of Attorney Ethics (OAE) before the Disciplinary Review Board (DRB), seeking final discipline of former Superior Court Judge Michael R. Imbriani (respondent). The motion was based on respondent's plea of guilty to the offense of theft by failure to make required disposition of property received, in violation of *N.J.S.A.* 2C:20–9. The DRB recommends that respondent be disbarred.

## I

Michael R. Imbriani was admitted to the New Jersey bar in 1957. For almost 20 years, he was a Judge of the New Jersey Superior Court. For 30 years, he assisted in the control and management of the financial affairs of the Community Medical Arts Building, Inc. (CMAB), a real estate corporation that leased offices to professionals.

We refer to this Court's removal decision, *In re Imbriani*, 139 *N.J.* 262, 652 *A.*2d 1222 (1995), for a description of events leading up to respondent's criminal conviction. CMAB was formed by respondent and others in 1963. Respondent acquired 12.5% of the issued common stock at that time. In 1970, he transferred his stock in CMAB to his wife. By 1982, respondent's wife owned forty percent of the stock because the stock of many shareholders had been purchased and the shares retired. The remaining shares were owned by three doctors.

From its inception, respondent helped manage CMAB and its primary asset, the Community Medical Arts Building in Bound Brook. Respondent collected rent checks from the corporation's bookkeeper, helped the bookkeeper pay CMAB's bills, and helped the bookkeeper file tax returns. He also assisted in the maintenance of the building.

In April 1992, the stockholders discovered that the mortgage on the building was close to foreclosure. They asserted that between April 30, 1989 and June 1992, respondent misappropriated rent and real estate tax checks payable to CMAB for his own use by endorsing such checks and depositing the monies into his personal account. In addition, they charged that between June 1987 and June 30, 1992, respondent misappropriated funds from CMAB's corporate bank account by withdrawing funds and using the money for his personal non-corporate purposes, issued corporate checks to payees whom CMAB owed no money, endorsed these checks in their names and used the funds for his own personal purposes, and that respondent removed funds from a CMAB

investment account for his own personal uses without stockholder authorization.

As part of a plea agreement with the state, respondent pled guilty on June 16, 1994, to a one-count accusation charging theft by failure to make required disposition of property received in the third degree in violation of *N.J.S.A.* 2C:20–9. Respondent was also permitted to make application to the Pretrial Intervention Program (PTI). The State agreed not to object to respondent's participation in PTI, should respondent be admitted, on the recommendation of the Program Director, contingent on the following: respondent pay restitution to CMAB in the amount of $173,000; respondent pay approximately $5,000 in state taxes on funds unlawfully obtained; and that respondent perform 300 hours of community service. The Program Director, however, rejected respondent's application.

Respondent sought Law Division review of the Program Director's decision. In the light of the Director's rejection of respondent's application, the State opposed respondent's Law Division request for admission to PTI. In a reported decision, the Law Division judge upheld the Program Director's determination. *State v. Imbriani*, 280 *N.J.Super.* 304, 654 *A.*2d 1381 (1994).

On March 8, 1995, the Law Division sentenced respondent to five years' probation and 300 hours of community service. Because respondent had already repaid approximately $85,000, he was ordered to make restitution in the amount of $88,002.93 and pay $5,314 in taxes on the illegally obtained funds. After sentencing, respondent appealed the denial of his application for PTI to the Appellate Division. Finding that, "[i]n April 1992, the stockholder[s'] ... investigation revealed that [respondent] had diverted [money] in tenant rent and real estate tax checks ... to his personal bank accounts," the Appellate Division affirmed respondent's denial of admission to PTI on June 3, 1996. *State v. Imbriani*, 291 *N.J.Super.* 171, 174–75, 677 *A.*2d 211 (App.Div. 1996).

## II

As noted, when respondent committed his offense, he was a New Jersey Superior Court Judge. He retired from the bench on May 1, 1994. Following his June 1994 guilty plea, respondent was temporarily suspended from the practice of law. The Advisory Committee on Judicial Conduct (ACJC) began an investigation into the matter. After conducting a hearing, the ACJC issued a Presentment finding that respondent had violated Article 6, Section 6, Paragraph 6 of the New Jersey Constitution, which prohibits members of the judiciary from engaging in business, and various Canons of the Code of Judicial Conduct requiring judges to observe high standards of conduct, to respect and comply with the law; to refrain from financial and business dealings interfering with and exploiting the proper performance of judicial duties; not to serve as an officer, director, manager, advisor, or employee of any business; and not to receive compensation for extrajudicial activities.

Relying on the ACJC's Presentment, this Court filed a complaint permanently to remove respondent from judicial office. *See N.J.S.A.* 2B:2A–3; *R.* 2:14–1. Respondent consented to his removal from judicial office. On February 15, 1995, we issued our judicial removal decision. *Imbriani, supra,* 139 *N.J.* 262, 652 *A.*2d 1222. We said:

> [W]e are satisfied that the ACJC's findings, as summarized in the Presentment, are amply supported by the evidence adduced at the hearing before the ACJC. We are fully cognizant of Respondent's long years of faithful and dedicated public service, and that Respondent has diligently and conscientiously discharged his judicial duties. However, our focus in this proceeding is determined solely by the public interest, and by our steadfast commitment to maintaining an independent and incorruptible judiciary. Respondent's conduct warrants his removal from judicial office. Respondent's resignation from judicial office effectuates his removal from the judiciary and vindicates our determination, based on the evidence before the ACJC, that Respondent's conduct is totally incompatible with continued judicial service. He shall not hereafter hold judicial office.
>
> [*Id.* at 266, 652 *A.*2d 1222 (citations omitted).]

In this case, we must now decide whether to remove respondent from the New Jersey bar. In its decision recommending disbarment, the DRB did not conclude that a misappropriation from

business associates would invariably require disbarment as under *In re Wilson,* 81 *N.J.* 451, 409 *A.*2d 1153 (1979). It was convinced, however, that respondent should be disbarred because the misconduct was "extreme and extended," the amount was substantial, and respondent "used various deceptive practices to accomplish the conversion of the funds." Finally, the DRB observed: "The Court has consistently subjected attorneys who commit acts of serious misconduct while serving in public office to stringent discipline, normally disbarment." *In re Yaccarino,* 117 *N.J.* 175, 197, 564 *A.*2d 1184 (1989).

## III

Respondent disputes certain key facts and asks the Court that he be permitted to practice law. Respondent firmly denies that he ever misappropriated any funds, much less the sum of $173,000. First, respondent argues that he had total and complete control over the financial affairs of CMAB, that his business partners were uninterested in the day-to-day affairs of the corporation, and that they gave respondent absolute discretion in the management of the business. He claims that he was entitled to determine the rentals to be paid, the distributions to be paid out, what loans respondent would receive and when and how they would be accounted for at the time when the corporation would be sold. Respondent further maintains that

> [i]t is undisputed that, other than some minor sums respondent used for his personal expenses, practically all of the funds received by respondent were loans which he was allowed for decades to take without the express approval of the president [of CMAB], Dr. Borow, but were clearly with [the president's] full knowledge and implicit approval at all times. It is beyond belief that respondent could act in the manner he did for decades without the knowledge and approval of [the president], a well-educated surgeon. Importantly, the reason why [the president] did not object to the loans taken by respondent is because ... [the president's] medical office received many and substantial trade-offs from this unusual arrangement.

Respondent maintains that the conclusions that he misappropriated funds were ill-founded factually and represent incorrect determinations drawn from his efforts amicably to resolve disputes

with his former partners. He argues that he is being unfairly judged because of his status as a judge. For example, he asserts that the sums due from him to the partnership were shown as loans on the books of account of the business. Respondent argues that "a good faith effort on his part to pay his loans to CMAB has been misconstrued by the media and others to suggest that he committed a serious crime."

He states that he "unselfishly ran the corporation for thirty years without asking for or receiving a single dime for his services, [therefore] he obviously believed that the use of minor sums to pay his personal expenses could reasonably be deemed to be some compensation for his services." [1]

In addition, respondent contends that theft does not require automatic disbarment as "there [exists] no hard and fast rule that requires a certain penalty for the conviction of a certain crime." *In re Lunetta,* 118 *N.J.* 443, 448, 572 *A.*2d 586 (1989). He asserts that the crime to which he pled was a "relatively minor offense of the third degree, . . . was not a major crime," [2] and that his forty years service as a member of the bar demonstrates a legacy of conscientious, trustworthy, and good behavior.

Finally, respondent argues that his discipline and removal from office as a judge, as documented in our earlier opinion, obviates any need to subject him to further discipline for the same unethical behavior based on his status as an attorney. He also maintains that this case is one of first impression in that the funds were misappropriated from business partners and did not involve the practice of law. Thus, respondent argues that disbarment is too severe a punishment.

---

[1] In making this argument, respondent concedes that he violated Article 6, Section 6, Paragraph 6 of the New Jersey Constitution, which prohibits a judge from engaging in gainful employment.

[2] A crime of the third degree authorizes a sentence of between three and five years but carries a presumption of no imprisonment. *N.J.S.A.* 2C:43–6a(3).

## IV

■ We do not dispute respondent's commendable reputation. Indeed, we appreciate and agree with the DRB's comments:

> For the vast majority of his public career, respondent not only met but exceeded [the high standards required of public officials]. Over the years, he compiled an impressive reputation as a talented judge, one to whom the Supreme Court could assign difficult cases with confidence that respondent would preside over them competently and capably.

However, a distinguished legal career does not foreclose discipline for criminal activity. Ordinarily, in attorney disciplinary proceedings, we give conclusive and binding effect to findings from judicial removal proceedings. *R.* 1:20–14(c); *Yaccarino, supra,* 117 *N.J.* at 183, 564 *A.*2d 1184. However, because respondent has disputed the findings in the removal proceeding, we consider his arguments carefully.

■ Regretfully for respondent, he had to have won in the courtroom the argument that the funds due to his partners represented loans and not conversions. His plea to failure to make proper disposition of property received conclusively established his guilt of the theft offense charged. A criminal conviction is conclusive evidence of guilt in related disciplinary proceedings.[3] *In re Goldberg,* 142 *N.J.* 557, 666 *A.*2d 529 (1995); *In re Magid,* 139 *N.J.* 449, 451, 655 *A.*2d 916 (1995); *In re Rosen,* 88 *N.J.* 1, 3, 438 *A.*2d 316 (1981).

■ When imposing attorney discipline based on a criminal conviction, we review not only a criminal conviction, but all of the surrounding circumstances. *Goldberg, supra,* 142 *N.J.* at 568, 666 *A.*2d 529; *In re Spina,* 121 *N.J.* 378, 389, 580 *A.*2d 262 (1990). Conviction of a third degree offense, establishes a misappropria-

---

[3] In addition to the state charges, respondent also pled guilty to a federal accusation based on his failure to pay federal taxes on the money improperly received from CMAB. In that case, respondent was sentenced to two months in federal prison. We do not base our disposition on this conviction since respondent disputes the state of mind requirement to establish guilt of the offense charged and no party has briefed the issue.

tion of a sum between $500 and $75,000. *N.J.S.A.* 2C:20–2b(2)(a). The background circumstances including the plea, restitution agreement, and PTI findings clearly and convincingly establish a misappropriation of a significant sum of money over an extended period of time. In his plea colloquy with the trial court, respondent acknowledged that his actions were unlawful.

At sentencing, the trial court summarized the background that it had found: that by depositing rent checks in his account respondent converted over $98,000 to his own use, that he had converted to his own use $29,000 from the corporate bank account and that by creating "purported creditors of the firm" he "diverted" such funds for his personal purposes. As noted, the plea agreement required respondent to pay $5,314 in back New Jersey taxes for the sums received. Assuming a tax rate of 6.5%, the plea encompassed approximately $75,000 of wrongfully acquired funds that were not loans. Were the sums involved loans, no taxes would have been due on their receipt.

The primary purpose of a disciplinary proceeding is to protect the public, not to punish attorneys. *In re Rutledge*, 101 *N.J.* 493, 498, 502 *A.*2d 569 (1986). "[P]reser[ving] the confidence of the public in the integrity and trustworthiness of lawyers in general" is our highest priority. *Wilson, supra,* 81 *N.J.* at 456, 409 *A.*2d 1153. However, equity requires us to balance "the interests of the public and the bar while [simultaneously] giving [due] consideration to the interests of the individual involved." *In re Mischlich,* 60 *N.J.* 590, 593, 292 *A.*2d 23 (1972). Retribution is not our objective.

In measuring the discipline to be imposed upon respondent, we begin by noting that attorneys must always behave honestly and must never engage in fraudulent or deceptive activity. *In re Hecker,* 109 *N.J.* 539, 550, 538 *A.*2d 354 (1988). When attorneys behave dishonestly, the "public respect for integrity in the administration of justice" is threatened. *Ibid.* Thus, we apply the following principles:

> Similar to a sentencing judge in a criminal matter, we take into consideration many factors in determining the proper discipline to be imposed. *Cf. N.J.S.A.* 2C:44–1. We consider the nature and severity of the crime, and whether the crime is related to the practice of law. We consider "evidence which does not dispute the crime but which shows mitigating circumstances [relevant to] the issue of whether the nature of the 'conviction merits discipline and, if so, the extent thereof.'" *In re Mischlich,* 60 *N.J.* at 593[, 292 *A.*2d 23] (citations omitted); *see In re Rosen,* 88 *N.J.* at 3[, 438 *A.*2d 316]; *In re Mirabelli,* 79 *N.J.* [597] at 601[, 401 *A.*2d 1090 (1979)]; *In re La Duca,* 62 *N.J.* [133] at 136[, 299 *A.*2d 405 (1973)]. Similarly, we consider evidence of an attorney's good reputation, his prior trustworthy professional conduct, and his general good character. *In re Mischlich,* 60 *N.J.* at 593[, 292 *A.*2d 23].
>
> [*In re Infinito,* 94 *N.J.* 50, 57, 462 *A.*2d 160 (1983).]

Respondent's conviction demonstrates that he committed a crime that adversely reflects on his honesty, trustworthiness or fitness as a lawyer (RPC 8.4) and shows that he engaged in conduct involving dishonesty, fraud, deceit or misrepresentation (RPC 8.4(C)).

Crimes of dishonesty disclose a fundamental character flaw. In the context of application for admission to the bar, we have concluded that a bar applicant "must possess a certain set of traits—honesty and truthfulness, trustworthiness and reliability, and a professional commitment to the judicial process and the administration of justice." *In re Matthews,* 94 *N.J.* 59, 77, 462 *A.*2d 165 (1983). Those traits are "fundamental norms that control the professional and personal behavior of those who as attorneys undertake to be officers of the court." *Id.* at 78, 462 *A.*2d 165.

Lawyers who serve in the judiciary have a duality of professional responsibility. *Yaccarino, supra,* 117 *N.J.* at 179, 564 *A.*2d 1184. They must be loyal to both the court to which they serve and to the profession of which they are members. *Ibid.* Indeed, to be a member of the judiciary, one must first be an attorney. *N.J. Const.* art. VI, § 6, ¶ 2 (1947). Thus, we recognize the indivisibility of lawyers' responsibility to the legal profession and to their judicial office. *Yaccarino, supra,* 117 *N.J.* at 179, 564 *A.*2d 1184. We are not unfairly assessing respondent's conduct because he is a judge but only recognizing what is expected of a lawyer and of a judge, even in a private capacity. We cannot

ignore the fact that respondent was a judge when the acts took place.

Even though respondent's conduct did not directly involve the discharge of judicial duties, it did directly compromise the judiciary as an institution. The actions of respondent reflect an attitude that is diametrically antagonistic to the values inherent in the Canons of Judicial Conduct, and is intolerable in a judge. That attitude is equally unacceptable in a lawyer.

[*In re Pepe,* 140 *N.J.* 561, 570, 659 *A.*2d 1379 (1995).]

Over thirty years ago, this Court observed:

A single act of misconduct [by a judge] may offend the public interest in a number of areas and call for an appropriate remedy as to each hurt. Thus it may require removal from public office. It may also require criminal prosecution. Still further it may require that the roster of attorneys be cleansed of a miscreant. The remedies are not cumulative to vindicate a single interest; rather each is designed to deal with a separate need.

[*In re Mattera,* 34 *N.J.* 259, 266-67, 168 *A.*2d 38 (1961).]

Thus, if a judge's conduct displays a lack of integrity necessary for his or her status as an attorney, the attorney may be disciplined for his or her conduct while a judge. *Yaccarino, supra,* 117 *N.J.* at 198, 564 *A.*2d 1184. Moreover, "[c]onduct by a judge may require disbarment if that conduct demonstrates such untrustworthiness, dishonesty or lack of integrity that the public must be protected from such a person as a lawyer." *Ibid.* Although respondent's conduct was in a private capacity, the conduct reflected on his capacity to practice law.

 Respondent has pled guilty to a crime of dishonesty resulting from several acts of misappropriation occurring over an extended period of time. Ordinarily, when a crime "evidence[s] continuing and prolonged, rather than episodic, involvement in [illegal activity and] ... [is] motivated by personal greed," the offense merits disbarment. *Goldberg, supra,* 105 *N.J.* at 283, 520 *A.*2d 1147; *see also In re Siegel,* 133 *N.J.* 162, 627 *A.*2d 156 (1993) (disbarring attorney who misappropriated partnership funds); *Lunetta, supra,* 118 *N.J.* at 449, 572 *A.*2d 586 (disbarring attorney involved in "protracted" criminal plan to receive and sell stolen securities).

Conversely, when the crime of dishonesty reflects an aberration not marked by personal gain but by youth and inexperience, we have not disbarred. *See In re Di Biasi*, 102 *N.J.* 152, 506 *A.*2d 719 (1986) (suspending attorney for three months who violated federal banking regulations, recognizing attorney's comparative inexperience and *lack of personal gain*); *In re Labendz*, 95 *N.J.* 273, 279, 471 *A.*2d 21 (1984) (suspending for one year a member of the bar who fraudulently misrepresented to a federally insured lender to obtain a mortgage, recognizing the respondent's outstanding reputation and unblemished record and *lack of personal gain*). In addition, we have "recognized that even in proceedings involving 'serious crimes' mitigating factors may justify imposition of sanctions less severe than disbarment or extended suspension." *In re Stier*, 108 *N.J.* 455, 458, 530 *A.*2d 786 (1987).

V

Respondent pled guilty to a crime involving personal gain. Respondent asks this Court, however, to consider the following mitigating circumstances in meting out his discipline: the suffering he and his family have already endured for this offense; the state sentence already imposed on respondent; the federal sentence already imposed on respondent; his discipline and removal from office as a judge; the fact that the conduct involved did not in any way involve the practice of law; the fact that his crime is one of the third degree; the fact that the funds were not used to indulge an extravagant lifestyle but to attend to family needs; and finally, to consider his otherwise unblemished record as an attorney and his good reputation in the community.

Respondent relies on *In re Hoerst*, 135 *N.J.* 98, 638 *A.*2d 801 (1994), to argue that his suspension is adequate discipline. In *Hoerst*, the respondent, a county prosecutor, pled guilty to third-degree theft by failure to make required disposition of public property in violation of *N.J.S.A.* 2C:20–9. The respondent resigned as prosecutor and was ordered to pay restitution of $7,500. The factual circumstances given for the plea were that he had

used the funds forfeited from criminals to attend with a companion, an assistant prosecutor and the prosecutor's wife, an out-of-state law-enforcement function that included a side trip. The Court held that this was "the only blot in [the] respondent's otherwise stainless professional career," suspending the respondent for six months. *Id.* at 102, 638 *A.*2d 801. Respondent argues that the factual circumstances of his case are in accord with *Hoerst.*

We disagree. In *Hoerst,* the respondent's plea established a single episode of misconduct involving a lesser sum of money. In addition, in *Hoerst* there had been no guidelines promulgated in connection with such official trips using forfeited funds. In contrast, respondent's plea acknowledged that his acts were unlawful. Respondent's misconduct involved numerous acts and substantial amounts of money.

Had respondent's crime involved only one act, *Hoerst* may very well have been controlling. However, respondent's criminal conduct encompassed a long period of time.

In affirming the denial of PTI for respondent, the Appellate Division observed

> the amount of the theft was too large, the thefts occurred over too long a time, the criminal practices were too diverse, and the victims were too aggrieved. [In addition,] the acts were purposeful and carefully planned, and resulted in considerable financial gain to defendant and loss to the victims.

> [*Imbriani, supra,* 291 *N.J.Super.* at 180, 677 *A.*2d 211.]

We cannot escape that reality. Whatever hamartia caused this tragic downfall, we cannot assess. The good that he has done in the conduct of countless civil and criminal trials will not be forgotten. We find that the appropriate discipline warranted is disbarment. Respondent is directed to reimburse the Disciplinary Oversight Committee for appropriate administrative costs.

So ordered.

*For disbarment*—Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN, and COLEMAN—6.

*Opposed*—None.

## ORDER

It is ORDERED that **MICHAEL R. IMBRIANI** of **BOUND BROOK**, who was admitted to the bar of this State in 1957, be disbarred and that his name be stricken from the roll of attorneys of this State, effective immediately; and it is further

ORDERED that **MICHAEL R. IMBRIANI** be and hereby is permanently restrained and enjoined from practicing law; and it is further

ORDERED that all funds, if any, currently existing in any New Jersey financial institution maintained by **MICHAEL R. IMBRIANI,** pursuant to *Rule* 1:21–6, be restrained from disbursement except upon application to this Court, for good cause shown, and shall be transferred by the financial institution to the Clerk of the Superior Court who is directed to deposit the funds in the Superior Court Trust Fund, pending further Order of this Court; and it is further

ORDERED that **MICHAEL R. IMBRIANI** comply with *Rule* 1:20–20 dealing with disbarred attorneys; and it is further

ORDERED that **MICHAEL R. IMBRIANI** reimburse the Disciplinary Oversight Committee for appropriate administrative costs.