752 A.2d 715

IN THE MATTER OF ROBERT V. KELLY,
AN ATTORNEY AT LAW.

Argued May 1, 2000—Decided June 16, 2000.

*Lee A. Gronikowski,* Deputy Ethics Counsel, argued the cause on behalf of the Office of Attorney Ethics.

*Robert V. Kelly,* argued the cause *pro se.*

PER CURIAM.

On February 11, 1998, District XIV Ethics Committee filed a complaint against respondent Robert V. Kelly, a Belmar attorney admitted in 1970, claiming that he used his status as an attorney to solicit clients for his wholly-owned business that located lost funds; used his law license to obtain funds on behalf of those clients from the United States Bankruptcy Court; and, instead of promptly delivering the funds to clients or holding them in trust,

used certain of those funds for personal expenses. The complaint alleged violations of *RPC* 1.15(a) (safeguarding property); *RPC* 1.15(b) (failure to promptly notify a client or third person of the receipt of property in which the client or third person has an interest and failure to promptly turn over the property); *RPC* 8.4(c) (conduct involving dishonesty, fraud, deceit or misrepresentation and "knowing misappropriation of escrow funds"); and *RPC* 1.15(d) and *R.* 1:21–6 (record-keeping violations).

A Special Master conducted disciplinary hearings and recommended disbarment. In turn, the Disciplinary Review Board (DRB) unanimously accepted that recommendation, finding that "the evidence clearly and convincingly established that respondent knowingly misappropriated trust funds." Respondent contests those conclusions.

We have conducted an independent review of the record, *R.* 1:20–16(c), and have determined that the ethical violations found by the DRB are supported by clear and convincing evidence. *In re Pena,* 162 *N.J.* 15, 17, 738 *A.*2d 363 (1999) (citing *In re DiMartini,* 158 *N.J.* 439, 441, 730 *A.*2d 346 (1999)).

## I.

The facts established by the record are as follows. In 1993, respondent incorporated National Recovery Services, Inc. ("NRS"); he was the sole shareholder, officer, director and employee. NRS was a business that located people who were owed funds from bankruptcy proceedings and then solicited their authority to recover those funds for a fee. In soliciting business, respondent used a letterhead that identified him as "Robert V. Kelly, Attorney At Law." He also signed the letter "Robert V. Kelly, Esq." The letter promised claimants that respondent's "client" NRS had found money due them and respondent and NRS were "willing to arrange recovery of these funds on a contingency fee basis." Included with the letter were a "Funds Recovery Contract," that stated that claimant agreed to compensate "Robert V. Kelly of National Recovery Services, Inc.," and a

"Limited Power of Attorney" that appointed "Robert V. Kelly of National Recovery Services, Inc." as the claimant's "attorney" solely for the recovery of unclaimed funds.

After successfully soliciting a claimant, respondent moved before the Bankruptcy Court for the payment of the unclaimed funds. In the motion papers, respondent identified the applicant as "Robert V. Kelly, Attorney At Law, of National Recovery Services, Inc." He signed the motion as the attorney representing NRS, and stated that "the applicant" had been "retained" by the claimant. Likewise, in the "Affidavit of Document Authenticity" and in the proposed order directing payment (submitted with the motion), respondent identified himself as the "authorized applicant" for the funds.

In May 1996, Theresa Cavanaugh, an assistant clerk with the United States Bankruptcy Court for the Eastern District of New York, advised the Office of Attorney Ethics (OAE) about a complaint she received from Robert Cehauskas in which he claimed that in October 1995 respondent had obtained the funds due to Cehauskas, but had not remitted them. Respondent denied any claim of wrongdoing and advised the OAE that he had not disbursed the funds because of a "bookkeeping error." In response to the OAE's planned audit of respondent's attorney records, he refused to produce NRS's records claiming (among other things) that NRS was not engaged in the practice of law. Respondent moved to quash the OAE's subpoena *duces tecum*, claiming that he had "not engaged in the practice of law in New Jersey during 1995, 1996 and the first calendar quarter of 1997." Respondent's motion to quash was denied.

The audit established that between February 1995 and June 1996, respondent deposited funds due to eight separate claimants into an NRS checking account instead of immediately remitting those funds. Payments were not made to the claimants for periods ranging from eighteen to 471 days. During that time of delay, respondent used the funds to pay for business and personal expenses, as well as to pay other claimants. The auditor found

that during the time the claimants' funds were ostensibly being held in escrow, the NRS account balance frequently fell below the amounts belonging to the claimants. Further, he found that funds belonging to two claimants were deposited into respondent's attorney trust account and, instead of being disbursed in a timely manner, were also used for respondent's personal and business expenses and to pay other claimants whose funds had been deposited into the NRS account.

The auditor concluded that respondent was engaged in "lapping," a practice in which funds due a claimant are dissipated and then funds from another claimant are used to pay the first claimant. Although the auditor was unable to trace the source of funds ultimately paid to three of the ten claimants because respondent's books had been neglected, he was able to conclude with certainty that respondent had misappropriated funds.

## II.

Respondent proceeded *pro se* at the DRB hearing.[1] He made a short statement, but primarily relied on his answers to the complaint.

Respondent did not dispute that he told claimants and the Bankruptcy Court that he was an attorney. However, respondent insisted that he acted as NRS's attorney only, not as attorney for the claimants. Respondent said that he used his attorney letterhead in an attempt to "allay any suspicions that [NRS] may be a scam operation" because at first, when he used the NRS letter-

---

[1] Prior to the hearing, respondent was assigned counsel. That attorney was eventually relieved because respondent refused to cooperate with him. The court assigned a second lawyer, and ordered respondent to cooperate with the new attorney or proceed *pro se*. The new attorney represented respondent on the first day of the hearing. One week prior to the second day of the hearing, the attorney moved to be relieved as counsel; that motion was denied. However, on the second day of the hearing, respondent discharged his attorney and requested an adjournment so he could prepare to proceed *pro se*. That request was denied, and the hearing proceeded.

head, potential claimants thought it was some sort of confidence game.

Respondent testified that he did not believe his representation of NRS constituted the practice of law, even though he held himself out to the claimants and the Bankruptcy Court as an attorney. He reasoned that, because in 1995 and 1996 it was not necessary to be an attorney to file an application in Bankruptcy Court on behalf of a claimant for the turnover of unclaimed funds, he was not engaged in the practice of law. Thus, he did not pay his annual assessment to the New Jersey Lawyers' Fund for Client Protection (CPF) in 1995 and 1996. Respondent explained that he paid those 1995 and 1996 assessments in 1997 because the Bankruptcy Court for the District of New Jersey changed its rules to authorize only an attorney, or a claimant *pro se,* to file a motion for the payment of unclaimed funds.

Respondent knew that because he had not paid his CPF dues he could not practice law in New Jersey. However, respondent claimed that he continued to use his attorney letterhead because it was his "understanding you still consider yourself an attorney at law even though you're not allowed to practice." He did not think "the failure to pay the annual fee changes your status as to your profession. Whether or not if [sic] you can actually practice it is something else." Respondent explained that he continued to appear in Bankruptcy Court even though he was ineligible to practice law because, in that particular court, "it didn't matter whether you appeared before them as an attorney or as a non-attorney."

Respondent offered several explanations for his delay in remitting the funds to the claimants. Those included bookkeeping errors, inability to locate claimants who moved without notifying him, misfiling of a claimant's address, hospitalization of a claimant, and, in the case of a corporate claimant, the death of the contact person in the corporation.

Respondent testified that he normally deposited claimants' funds in the NRS account. However, sometimes he made a

mistake because he was overwhelmed by his bookkeeping responsibilities and deposited the funds into his attorney trust account instead. Respondent also stated that at times he deliberately deposited funds into the trust account as a "precautionary measure" because he was concerned the IRS might place a lien on the NRS account.

Respondent conceded that he used the claimants' funds for prohibited purposes. However, he stated that he did not know that those funds should have been deposited into his trust account; respondent had worked only as a tax accountant since his admission to the bar, and thus was not familiar with attorney recordkeeping rules. Moreover, because respondent did not believe his actions on behalf of NRS constituted the practice of law, he did not learn how to keep proper attorney records pursuant to *Rule* 1:21–6.

Respondent made several other assertions in an attempt to excuse his conduct. For instance, he claimed that although his NRS and trust account balances sometimes fell below the amounts due to the claimants, those "missing" funds were, in fact, available but delayed because respondent postponed depositing checks into the NRS account because of his concern about an IRS lien. There is no evidence in the record to support that contention. Respondent also claimed that he issued trust account checks to pay his business and personal expenses only "in an effort to cut short and reduce the overall record-keeping responsibilities which overwhelmed [me] as a sole practitioner and not in an attempt to knowingly misappropriate funds"; he was "simply not cognizant of the fact that such procedures were incorrect or deficient."

Finally, respondent claimed that from 1992 until the early part of 1997 he suffered from depression that caused his divorce, loss of his job and estrangement from his daughter. Respondent stated that his depression affected his ability to properly handle his business affairs. Respondent admitted that during those years he also abused alcohol. He did not seek any psychological or medical

help, but presented a psychiatrist's report from March 1999 to the DRB.

### III.

On the above facts, the DRB found that respondent was "guilty of unethical conduct." It concluded that respondent acted as the attorney for the claimants when he petitioned the Bankruptcy Court on their behalf for payment of unclaimed funds. It found that respondent was obligated to hold his clients' funds in trust until they were properly disbursed.

It also determined that there was no indication that respondent was "out of touch with reality or could not appreciate the nature and quality of his actions" because of depression or alcohol abuse. His psychiatric report did not show respondent was incompetent or incapable of controlling his actions. In fact, respondent told the DRB that his psychiatric and alcohol problems were never so severe that he could not differentiate between right and wrong; rather the problems made him "very indifferent" and "very apathetic."

The DRB thus unanimously recommended disbarment. We agree.

### IV.

In measuring the discipline to be imposed, "we begin by noting that attorneys must always behave honestly and must never engage in fraudulent or deceptive activity." *In re Imbriani,* 149 *N.J.* 521, 530, 694 *A.*2d 1030 (1997) (citing *In re Hecker,* 109 *N.J.* 539, 550, 538 *A.*2d 354 (1988)). When attorneys behave dishonestly, the "public respect for integrity in the administration of justice" is threatened. *Ibid.*

We find no merit in respondent's claim that he was not acting as an attorney in recovering bankruptcy funds and that his activities did not constitute the practice of law. Indeed, he used his attorney status to allay the fears of potential clients and actually

filed documents in the Bankruptcy Court as an attorney-at-law. He also deposited some of the recovered funds into his Attorney Trust Account.

We reject respondent's contention that his conduct should be excused because any acts he performed as an attorney were on behalf of NRS and not the claimants. Even if that were the case, his actions still would support disbarment. In *In re Servance*, 102 *N.J.* 286, 292, 508 *A.*2d 178 (1986), respondent, an attorney, accepted substantial sums of money from clients for investment in a so-called "get rich quick" investment scheme. In the three matters before the DRB, the clients failed to receive their expected profit and respondent failed to communicate with them when they inquired about the status of their investments. *Ibid.* Respondent claimed that his full time occupation was that of an insurance agent, and that he did not practice law. However, the DRB found, "each of the three complainants trusted respondent with their money because respondent was an attorney and not because he was an insurance agent." *Ibid.* We concluded that disbarment was appropriate even though no attorney-client relationship existed when the money was received from the clients for investment. *Id.* at 287, 292, 508 A.2d 178. *See also In re Imbriani, supra,* 149 *N.J.* at 532, 694 *A.*2d 1030 (disbarring attorney and former judge who plead guilty to theft by failure to make required disposition of property received even though his "conduct was in a private capacity" because "conduct reflected on his capacity to practice law"); *In re Siegel,* 133 *N.J.* 162, 170, 627 *A.*2d 156 (1993) (ordering disbarment even though attorney misappropriated funds from his law partners and not clients); *In re Spina,* 121 *N.J.* 378, 384, 390, 580 *A.*2d 262 (1990) (finding "immaterial" that respondent's conduct had not occurred in context of lawyer-client relationship and disbarring him after he pled guilty to federal misdemeanor of taking property belonging to his employer); *In re Hollendonner,* 102 *N.J.* 21, 28–29, 504 *A.*2d 1174 (1985) (announcing that escrow funds and client trust funds are "so akin" to each other that, prospectively, misappropriation of escrow funds will also require disbarment).

## V.

Respondent's remaining contentions—poor bookkeeping and eventual recoupment of funds by clients—even if true, do not provide mitigation or justification, for his actions. *See In re Freimark,* 152 *N.J.* 45, 57, 702 *A.*2d 1286 (1997) (noting that even where attorney "borrows" trust money but pays it back, it is misappropriation requiring disbarment); *In re Davis,* 127 *N.J.* 118, 127, 603 *A.*2d 12 (1992) (explaining that "shoddy bookkeeping alone" does not prove knowing misappropriation of client funds, yet it is "no defense" to such misappropriation).

We agree with the DRB that respondent presented no proof that his depression or alcohol problems eroded his competency. In other cases, we have rejected an attorney's claim that a mental condition or illness demonstrated "a loss of competency, comprehension or will of a magnitude that could excuse egregious misconduct that was clearly knowing, volitional and purposeful." *In re Jacob,* 95 *N.J.* 132, 137, 469 *A.*2d 498 (1984). *See, e.g., In re Roth,* 140 *N.J.* 430, 448, 658 *A.*2d 1264 (1995) (major depression); *In re Davis,* 127 *N.J.* 118, 130–32, 603 *A.*2d 12 (1992) (alcoholism); *In re Steinhoff,* 114 *N.J.* 268, 273–74, 553 *A.*2d 1349 (1989) (drug dependency). In those cases, we determined that the "medical facts" presented did not provide a sufficient basis for "a legal excuse or justification" in mitigation of the respondents' acts of misappropriation. *Jacob, supra,* 95 *N.J.* at 137, 469 *A.*2d 498.

Here, the psychiatrist's March 1999 report was attached to respondent's second amended answer but not admitted into evidence and the psychiatrist did not testify at the hearing. Even if we were to overlook those deficiencies and accept the report, it offers no evidence excusing respondent's knowing misappropriation. Further, the testimony of laywitnesses that respondent appeared to be suffering from depression and alcoholism during the relevant time period was inadequate to establish that respondent was incompetent.

## VI.

In short, we are satisfied from our thorough review of this record that the ethical violations found by the DRB are supported by clear and convincing evidence and that they warrant disbarment. Respondent shall reimburse the Disciplinary Oversight Committee for appropriate administrative costs, including the costs of transcripts.

*For disbarment*—Chief Justice PORITZ and Justices O'HERN, STEIN, COLEMAN, LONG and VERNIERO—6.

*Opposed*—None.

## O R D E R

It is ORDERED that **ROBERT V. KELLY** of **BELMAR**, who was admitted to the bar of this State in 1970, be disbarred and that his name be stricken from the roll of attorneys of this State, effective immediately; and it is further

ORDERED that **ROBERT V. KELLY** be and hereby is permanently restrained and enjoined from practicing law; and it is further

ORDERED that all funds, if any, currently existing in any New Jersey financial institution maintained by **ROBERT V. KELLY** pursuant to *Rule* 1:21–6 be restrained from disbursement except on application to this Court, for good cause shown, and shall be transferred by the financial institution to the Clerk of the Superior Court, who is directed to deposit the funds in the Superior Court Trust Fund, pending the further Order of this Court; and it is further

ORDERED that **ROBERT V. KELLY** comply with *Rule* 1:20–20 dealing with disbarred attorneys; and it is further

ORDERED that **ROBERT V. KELLY** reimburse the Disciplinary Oversight Committee for appropriate administrative costs.