IN THE MATTER OF VINCENT J. INFINITO, AN ATTORNEY AT LAW.

Argued June 16, 1983—Decided July 20, 1983.

*Colette A. Coolbaugh,* Secretary, argued the cause for complainant Disciplinary Review Board.

*Bernard F. Conway* argued the cause for respondent.

PER CURIAM.

This disciplinary proceeding arose as a result of a presentment that was filed by the District XI Ethics Committee against respondent, a member of the bar, based upon respondent's conviction for larceny of property valued at over $500.00 and conspiracy to commit larceny. After hearing on the present-

ment, the Disciplinary Review Board (Board) accepted the Committee's findings that the respondent had violated *DR* 1–102(A)(3) and (4). The majority of the Board recommended that respondent be suspended from the practice of law for eighteen months, retroactive to January 26, 1982, the effective date of his temporary suspension.

We disagree and adopt instead the minority's recommendation that respondent be suspended from the practice of law for three years retroactive to January 26, 1982.

I

The Board accurately sets forth the relevant facts in its Recommendation, viz:

"The respondent's conviction resulted from the unauthorized use by respondent and his wife of funds which belonged to two adult sisters, Mary Ellen and Kathleen Leonardis. The sisters were placed in the respondent's home during 1972 by a social worker from the Division of Mental Retardation (hereinafter Division). Both Kathleen and Mary Ellen had been institutionalized for most of their lives, and worked as domestics in a nursing home operated by Roman Catholic Nuns for four years prior to being placed with the Infinitos. During that time, each of the sisters had accumulated several thousand dollars in a savings bank near the housing home. The sisters were to act as live in domestic help in the Infinito home, and, in return, the respondent was required to pay Kathleen and Mary Ellen on a weekly basis. The respondent understood that $10.00 each was the appropriate amount. No contract or written understanding was made, and after the first several weeks, only semi-annual inspections were made by the Division.

"At hearing before the District XI Ethics Committee, the respondent advised that he initially paid the sisters by check, but they complained because of the inconvenience of going to the bank to cash the checks. Thereafter he gave them cash. After several months he paid them periodically as they needed the

money so that they would not spend the money all at once and regret not having any money for the remainder of the week. . Respondent contended that his actual expenditure for each of the sisters was probably in excess of $20.00 per week, but he maintained no records to substantiate these payments.

"In December of 1974, after nearly two years with the Infinitos, Kathy and Mary Ellen were taken to their savings bank to close out their accounts and open new accounts closer to their new residence. Two checks were issued by the savings bank, one to Mary Ellen for $4,000.00 and one to Kathleen for $5,000.00. The balance of $260.35 was withdrawn in cash. On December 19, 1974, the following day, the checks were presented to the Morris County Savings Bank. Two accounts were opened. The $4,000.00 check was deposited directly into one account opened in the name of Kathleen and Mary Ellen Leonardis. The second account was opened in the name of Marie Infinito, respondent's wife. Four thousand dollars from the five thousand dollar check were deposited into that account. Prior to acceptance of that deposit by the bank, both Mrs. Infinito and respondent were required by the bank to endorse the check in question. The remaining $1,000.00 was received in cash and used by the sisters to purchase a color television set, as well as for clothing and Christmas gifts. Respondent testified before the Committee that he was not aware of the specific usage of the account opened in Marie Infinito's name although he understood that withdrawals were made from time to time.

"In the Spring of 1976, respondent was first contacted by two social workers from the Division. Respondent's wife had advised these Division employees that he had kept detailed records of disbursements to and expenditures on behalf of the Leonardis sisters, although he had not. When respondent was unable to produce complete records, the Division representatives suspected misappropriation of funds. Thereafter, at the Division's insistance, respondent entered into an agreement with the Division to pay Kathleen $20.00 per week and to repay salary arrearages of $5,700.00 and savings account deficiencies of $3,598.15 as

54

calculated by the Division, for a total of $9,298.15. Since Mary Ellen was then terminally ill, and died on March 15, 1977, the monthly payments of $129.14 were payable only to Kathleen. The respondent advised the Committee that he felt unfairly pressured to enter the agreement, which he contended was improperly calculated. As a result, he begrudged making the payments and they were generally made late, and eventually not at all.

"At the end of 1977, and subsequent to Mary Ellen's death, the Division demanded full payment. When he did not comply with this demand, the Division referred the matter to the Morris County Prosecutor. A 13 count indictment was thereafter returned against respondent and his wife. Neither respondent nor his wife testified at trial. According to respondent, he was aware that his wife had made false statements to both the Division and the Grand Jury, and determined not to testify as a result. Convictions of both respondent and his wife were obtained on Counts 1 and 13, which charged theft of property valued at over $500.00 and conspiracy to commit larceny, embezzlement and violations of State election laws. An attempt at severance of the trial was unsuccessful and denial of severance was the only issue on appeal. Respondent received suspended concurrent sentences of from one to three years on both counts, and was placed on probation for two years. The sentencing judge wrote in the judgment of conviction:

"Intentional premeditated deliberate nature of offense requires custodial sentence but lack of prior record, restitution and lack of viciousness permit suspension of sentence."

"At hearing before the District XI Ethics Committee, the respondent conceded that it was improper to open the account in his wife's name and to fail to keep specific records to justify every withdrawal. He disclaimed any intent to steal the sisters' funds. He further indicated that the account was opened in his wife's name at the suggestion of a Mrs. Brightmen, who was then a social worker with the Division, to avoid jeopardizing any future need for SSI (Supplemental Security Income) benefits.

"Respondent further offered for consideration his civic and charitable efforts with regard to the Assumption Church and private rehabilitation organizations including Integrity House, a drug rehabilitation center which he helped to establish. His professional endeavors included, at various times, positions as a municipal attorney, a municipal prosecutor and planning board attorney. Subsequent to being indicted, and until his suspension from the practice of law on consent at conclusion of his appeal, respondent practiced law from his home. He had previously withdrawn from a partnership arrangement and sold his interest in his office building when his practice dwindled due substantially to the extensive publicity surrounding the indictment and trial. While his appeal was pending with the Appellate Division foreclosure proceedings on his home were forestalled by a group of friends who established a fund administered by the Assumption Church, and raised $25,000.00 to pay off the mortgage arrearages. Respondent currently works part time as a bartender, while his wife is employed in a day-care nursery. Numerous witnesses, including neighbors, attorneys and a monsignor, testified before the Committee as to respondent's character. He was described as a good attorney known for his civic and charitable involvement. Several individuals indicated that the offense underlying the criminal conviction was out of character for the respondent. It was also stated that the publicity surrounding the trial and subsequent thereto was vicious and constituted a personal attack by the local newspaper publisher. All of those testifying requested leniency for the respondent.

"The Committee concluded that respondent had violated *DR* 1–102(A)(3) by engaging in illegal conduct which adversely reflects on his ability to practice law, as well as *DR* 1–102(A)(4) by engaging in conduct involving dishonesty, fraud, deceit or misrepresentation. The Committee noted, however, that respondent's conduct which led to the conviction was neither as nefarious nor as calculating as the conviction standing alone might suggest. The Leonardis sisters were established as members of the family at the time the bank accounts were opened. The

family atmosphere contributed to the informal attitude concerning the sisters' money. The Committee concluded further that both the source and content of the character testimony merited some consideration, as did the 'grossly excessive newspaper coverage' of the case.

"The Committee indicated that the circumstances of the offense and mitigating factors support a recommendation for leniency here."

Upon a review of the full record, the Board accepted the Committee's conclusion that respondent's conviction for larceny of property valued over $500.00 and conspiracy to commit larceny clearly violated *DR* 1–102(A)(3) and (4). In reaching its decision that respondent should be suspended from practice for eighteen months, the Board, as did the sentencing judge and the Committee, gave serious consideration to the following mitigating factors:

The Board agrees that the "family" relationship between the Infinitos and the Leonardis sisters resulted in an informal attitude concerning the sisters' funds. While this does not excuse the financial improprieties, it does render the offenses less heinous. The Board further accepts the Committee's analysis of the character testimony submitted.

The respondent's conviction did not arise from misconduct in the practice of law. His prior unblemished record and numerous civic and charitable contributions should not be overlooked. Similarly, the high regard felt for respondent by his peers in the legal profession as well as friends and neighbors must be considered.

## II

A criminal conviction is conclusive evidence of guilt in disciplinary proceedings. Once an attorney is convicted of a crime, the sole question remaining for the Court is the measure of discipline to be imposed. *In re Rosen,* 88 *N.J.* 1, 3 (1981); *In re Mirabelli,* 79 *N.J.* 597, 602 (1979); *In re La Duca,* 62 *N.J.* 133, 136 (1973); *In re Mischlich,* 60 *N.J.* 590, 592–93 (1972); *In re Isserman,* 9 *N.J.* 269, 277–78, reh. den., 9 *N.J.* 316 (1952), *cert.* denied, *Isserman v. Ethics Committee etc.,* 345 *U.S.* 927, 73 *S.Ct.* 706, 97 *L.Ed.* 1357 (1953), reinstatement granted, 35 *N.J.* 198 (1961).

Our goal in these hearings is to protect the interests of the public and the bar while giving due consideration to the interests of the individual involved. *In re Mischlich,* 60 *N.J.* at 593. Similar to a sentencing judge in a criminal matter, we take into consideration many factors in determining the proper discipline to be imposed. *Cf. N.J.S.A.* 2C:44–1. We consider the nature and severity of the crime, and whether the crime is related to the practice of law. We consider "evidence which does not dispute the crime but which shows mitigating circumstances [relevant to] the issue of whether the nature of the 'conviction merits discipline and, if so, the extent thereof.'" *In re Mischlich,* 60 *N.J.* at 593 (citations omitted); *see In re Rosen,* 88 *N.J.* at 3; *In re Mirabelli,* 79 *N.J.* at 601; *In re La Duca,* 62 *N.J.* at 136. Similarly, we consider evidence of an attorney's good reputation, his prior trustworthy professional conduct, and his general good character. *In re Mischlich,* 60 *N.J.* at 593.

Accordingly, we do not establish a hard and fast rule that requires a certain penalty be imposed upon conviction of a certain crime. Every disciplinary matter is factually different. Therefore, we judge every case on its own merits.

### III

Applying the above analysis to the facts of this case, we agree with the Board's determination that respondent violated disciplinary rules. He violated *DR* 1–102(A)(3) by engaging in "illegal conduct that adversely reflects on his fitness to practice law," and he violated *DR* 1–102(A)(4) by engaging in "conduct involving dishonesty, fraud, deceit, or misrepresentation."

We recognize, however, the existence of mitigating factors, namely, respondent's treatment of the Leonardis sisters as part of the Infinito family. In particular we note that even after respondent's misconduct, the surviving twin, Kathleen, returned to the Infinito home and stayed for several weeks until she was able to find employment. Further, we find—as did the Committee, the Board, and the sentencing judge—that respondent's

misconduct in this case represents an exception to his hitherto exemplary record. Prior to this unfortunate incident, respondent had an unblemished professional career and was highly regarded in the legal and general community. He was actively involved in community affairs, and he generously gave of his time to numerous church and civic activities.

Nevertheless, despite our agreement with the Board's analysis of the mitigating circumstances in this case, we disagree with the Board's recommended penalty. Respondent has been convicted of crimes, and we think that the imposition of a eighteen month suspension from the practice of law is not sufficient discipline.

Accordingly, having given due consideration to all of the factors involved, we conclude that the interests of the public will be served properly by respondent's suspension from the practice of law for a period of three years from January 26, 1982, the date of his temporary suspension, and until further order of this Court. We also impose upon respondent the obligation to reimburse the Administrative Office of the Courts for appropriate administrative costs, including the cost of producing transcripts.

So ordered.

O'HERN, J., dissenting.

I must respectfully dissent from the Court's disposition.

I dissented in *In re Hughes,* 90 *N.J.* 32 (1982), because I agreed with Justice Schreiber that the mitigating circumstances there far outweighed the extent of the misconduct, and did not call for disbarment. I cannot find sufficient distinction between the cases that would enable me to judge this attorney any more favorably than Hughes was judged.

I share the sympathy of the majority for a lawyer who enjoys great respect in his community and even the affection of one of the victims. Yet we must accept the jury verdict.

I would disbar.

59

*For suspension*—Chief Justice WILENTZ and Justices SCHREIBER, HANDLER, POLLOCK and GARIBALDI—5.

*Dissenting*—Justice O'HERN—1.

## ORDER

It is ORDERED that VINCENT J. INFINITO of MORRISTOWN be suspended from the practice of law for three years, effective January 26, 1982, and until further order of this Court; and it is further

ORDERED that respondent reimburse the Administrative Office of the Courts for appropriate administrative costs, including the production of transcripts; and it is further

ORDERED that respondent continue to be restrained and enjoined from the practice of law during the period of his suspension and that he continue to comply with all regulations of the Disciplinary Review Board governing suspended, disbarred or resigned attorneys.