3 A.3d 496

IN THE MATTER OF DAVID J. WITHERSPOON,
AN ATTORNEY AT LAW.

Argued December 1, 2009—Decided July 29, 2010.

LaVecchia, J., dissented and filed opinion in which Albin, J., joined.

*John McGill, III,* Assistant Ethics Counsel, argued the cause on behalf of the Office of Attorney Ethics.

*Bernard K. Freamon* argued the cause for respondent.

Justice HOENS delivered the opinion of the Court.

This matter, which comes before the Court on a stipulated factual record, raises questions concerning the appropriate level of discipline to be imposed on a member of the bar who has used his license to practice law as a means to seek sexual favors from some of his clients. As offensive as that behavior is, as with all matters

of discipline, it can only be addressed by considering it in accordance with the specific *Rules of Professional Conduct* (*RPCs*) that the attorney has violated and can only be appropriately punished in accordance with longstanding principles that form the existing and accepted hierarchy of our attorney disciplinary system. Applying those principles to the record before us, we reject as inadequate the disciplinary sanction of a three-month suspension recommended by the Disciplinary Review Board. For the reasons that follow, we instead impose upon respondent the sanction of suspension from the practice of law for the period of one year.

I.

Although this disciplinary matter arises in the context of a three-count attorney ethics complaint, the proceedings have focused only on the count involving sexual improprieties. For the sake of completeness, however, we recite all of the counts prior to discussing and evaluating the questions that arise from the stipulated record of respondent's sexually inappropriate behavior.

The charges included in the three-count complaint can be summarized briefly. Count One charged respondent David Witherspoon with sexual harassment, sexual discrimination and conflicts of interest, in violation of *RPC* 1.7(a)(2), *RPC* 4.4, *RPC* 8.4(d), and *RPC* 8.4(g). Count Two charged respondent with practicing law while ineligible based on respondent's failure to pay the required annual assessment to the Lawyers' Fund for Client Protection, in violation of *RPC* 5.5(a)(1) and *RPC* 8.4(d). Count Three charged respondent with recordkeeping violations comprised of failing to maintain fully descriptive client ledgers, failing to conduct monthly trust account reconciliations and failing to maintain a running balance in the trust account checkbook ledger, all in violation of *Rule* 1:21–6 and *RPC* 1.15(d).

Respondent admitted that he had practiced for more than a year while ineligible, arguing in mitigation that this was merely due to oversight. He also conceded that he had failed to properly maintain his books and records, offering in mitigation that he

rarely used the trust account because of the nature of his practice and that no client had been harmed or had even complained about the way in which trust funds were handled.

Because respondent did not contest two of the counts charged, the proceedings were largely directed to Count One. Even that Count, however, was the subject of a stipulated factual record, with respondent offering explanations and arguments in mitigation. But it is Count One, and the issue as to the level of discipline appropriate for the behavior that gave rise to its charges, that has divided the members of each panel at virtually every level of the disciplinary process.

More to the point, it is Count One, and the discipline that it demands, that today divides this Court as well. We are therefore constrained to discuss at some length the underlying facts, the arguments raised by respondent by way of explanation or mitigation, and the way in which the ethical violations demonstrated by the record fit into the larger framework of our disciplinary precedents.

### A.

According to the stipulated factual record, respondent offered discounted legal fees to one client in 2001, and on several occasions late in 2005 and early in 2006 to two clients and a family member of another client, in exchange for sexual favors of various kinds.

The first incident [1] of this kind of behavior occurred in July 2001, when S.S. retained respondent to represent her in a bankruptcy matter. During that time, he asked her "about her personal life, ask[ed] if she would go out with him and made inappropriate sexual advances to[ward her]." S.S., who believed that respondent was offering "to exchange sexual favors for represen-

---

[1] The record reflects that the grievance filed by S.S. as a result of this conduct was initially reviewed and dismissed. Because it was so similar to the three subsequently filed grievances, it was reconsidered when the other three grievances were filed against respondent.

tation in her bankruptcy matter," rejected his importunings and sought other counsel.

In August 2005, T.B., whose father was a bankruptcy client of respondent's, told respondent that her father did not have the sum of $300 that he then owed for respondent's services. According to the stipulated facts, respondent offered to forgive that part of the debt if he could "meet T.B. in a hotel room for three hours." Several months later, in January 2006, T.B.'s father was again behind in his payments, at which point he owed $200 that T.B. was not able to pay. Respondent told T.B. that she could "take care of the $200" if she would "come to his office in a bathing suit and dance for him." T.B. believed that these were efforts by respondent to exchange legal services for sexual favors.

In September 2005, S.B. retained respondent to represent her in a bankruptcy matter. During one of her visits to his office, when she was accompanied by a female friend, respondent commented that "many gay women 'come on' to" him. He then said that "he would like to see S.B. and her friend 'make out' . . . [and that if they did so] he would file the bankruptcy free of charge." Some time later, when S.B. arrived to make a payment toward the agreed-upon fee and told him that there was another creditor to be added to the petition, respondent "stated that he would only add the creditor to S.B.'s bankruptcy if she lifted her skirt." In yet another incident thereafter, when S.B. arrived to pay a balance due for legal services, respondent told her that she "could satisfy her outstanding legal fees by either allowing him to watch her with her female friend or by allowing him to join in." S.B. refused each of these suggestions, understanding them to be offers to exchange legal services for sexual favors. She eventually retained alternate counsel to complete her bankruptcy matter.

Finally, in September 2005, A.C. retained respondent in connection with her bankruptcy petition. When she arrived for one of her appointments, respondent made several remarks about her sexual orientation. He said, "Oh, so you're the gay girl," and "suggest[ed] that A.C.'s lesbianism was caused by a bad experi-

ence with the male sex organ." Thereafter, following an appearance with A.C. in bankruptcy court, respondent told her that "he was a 'breast man,' that she was looking good that day and that if she came back to his office and joined him on his 'office couch,' he would return to her $660 of the legal fees she [had] paid." A.C. regarded some of these remarks as "constitut[ing] a denigration of her lesbian lifestyle" and others as being "a proposal to exchange sexual favors for legal fees."

## B.

During the hearing on the complaint before a panel of the District VI Ethics Committee (DEC), respondent conceded that each of the grievants would testify in accordance with the foregoing stipulated facts. In his defense, he offered a variety of explanations, rebuttals and arguments he characterized as being in mitigation. For example, he described the atmosphere in his office as being very relaxed and a place where conversations on all subjects of a highly personal nature are common. More to the point, he asserted that the comments he made were purely in jest and that he never intended to insult or demean any of the grievants.

In addition, respondent offered several specific responses to the charges. He commented that S.S. is a Muslim, describing her as someone who "wears the full garb, the full cover from head to toe," and that, at her request, he had gone out of his way to accompany her to a creditor's meeting shortly after September 11, 2001. He offered this testimony to demonstrate that, at a time when many people in this country were far from open-minded about people of the Muslim faith, he was willing to travel openly with her and appear at her side in public as her attorney. Although not refuting the stipulated facts as to which S.S. would testify, he contended that her grievance was actually motivated by her dissatisfaction about the way in which her bankruptcy matter had proceeded.

As for T.B.'s grievance, respondent testified that he did not recall making the comments, asserted that whatever he said would have been meant as a joke, and claimed that had he been aware that she was offended, he would have immediately apologized.

Respondent's assertions in response to the grievances filed by A.C. and S.B. are related. In short, he believes that all of his comments to either one were in jest, and that they were, in part, initiated by S.B. He testified that his remarks were prompted by S.B. who showed him photographs of a vacation she had just had with a girlfriend at a resort known for nude beaches and alternate lifestyles. Furthermore, he testified that he believed that S.B. "enticed her friend A.C. to file a complaint when S.B. did not pay the balance of her legal fees and she got annoyed at" respondent.

As part of his testimony before the DEC, respondent offered that he never meant to insult or demean anyone and said that, with the benefit of hindsight, he would make a different choice concerning his interactions with clients in the future. Regarding the four grievants, respondent also stated that he would "love to get the chance to tell them [he was] sorry if [he] insulted [them]."

The DEC found respondent's assertion that anything he said was meant only in jest to be "entirely unpersuasive," and it concluded that his comments "had no substantial purpose other than to embarrass the victims and/or clients," were "flagrantly violative of accepted professional norms," and constituted discrimination based on sex or sexual orientation. The DEC therefore found that respondent had violated *RPC* 1.7(a)(2) (conflict of interest), *RPC* 4.4 (purpose to embarrass, burden or delay), *RPC* 8.4(d) (conduct prejudicial to the administration of justice) and *RPC* 8.4(g) (sexual discrimination or harassment), all as charged in Count One. Based on respondent's concessions, the DEC concluded that he had violated *RPC* 5.5(a)(1) and *RPC* 8.4(d), as charged in Count Two, and *Rule* 1:21–6 and *RPC* 1.15(d), as charged in Count Three.

The DEC unanimously recommended that respondent be censured for these violations. In addition, as to Count One, the DEC

recommended that respondent be required to attend sexual harassment sensitivity training, and as to Count Three, that he be required to put certain accounting controls in place.

## C.

The matter then came before the Disciplinary Review Board (DRB) for de novo review. *R.* 1:20–15(e)(3). After its consideration of the record, the DRB found that the evidence was clear and convincing and agreed with the DEC that respondent's conduct was unethical. However, the DRB reached different conclusions in its analysis of whether that conduct violated all of the numerous *RPC*s and the Court Rule that the DEC found had been violated, and disagreed with the DEC's recommendation of a disciplinary sanction.

In summary, as to Count One, the DRB concluded that respondent had created a conflict of interest by putting "his own prurient interests above those of his clients, [thereby] creat[ing] the possibility that he would not view their matters favorably if his advances were rejected." *See RPC* 1.7(a)(2). The DRB also found that respondent had violated *RPC* 8.4(g) by sexually harassing all four of the grievants and by discriminating against two of them based on their sexual orientation. However, the DRB found that the evidence was not sufficiently clear and convincing that it could find that respondent's conduct was prejudicial to the administration of justice, or that his purpose was to embarrass, burden or delay, as a result of which the DRB dismissed the charges that respondent had violated *RPC* 8.4(d) and *RPC* 4.4(a). Finally, with regard to Counts Two and Three of the complaint, the DRB found that the evidence was clear and convincing and that respondent had violated *Rule* 1:21–6 and *RPC*s 1.15(d), 5.5(a)(1) and 8.4(d).

After a review of the factual record, including respondent's prior disciplinary history, and after consideration of numerous precedents, the DRB rejected the DEC's recommendation that respondent be censured. Instead, a majority of the DRB determined that the imposition of a three-month suspension from the practice

of law would be the appropriate quantum of discipline. Two members of the DRB filed a dissenting opinion in which they contended that a three-month suspension would be an insufficient sanction. In light of respondent's disciplinary history, lack of contrition and poor attitude toward the ethics rules, which the dissenting DRB members characterized as evidence of "both arrogance and a lack of moral values," they asserted that a six-month suspension was required.

## II.

The only issue before this Court is the appropriate quantum of discipline to be imposed on respondent for his ethical violations. Sadly, this is neither the first time that we have been required to deal with conduct of this kind, nor is it the first time that we have had occasion to discipline this particular member of the bar.

In order to evaluate the conduct and fix the appropriate level of discipline, we begin, as we must, with a review of our previous opinions. Published decisions addressing sexual indiscretions by members of the bar yield a variety of appropriate disciplinary sanctions, each depending on the specific situation. Those sanctions have ranged from reprimands to disbarment. Our review and interpretation of those precedents informs our decision in this case.

We have in the past disbarred attorneys for sexual offenses that resulted in criminal convictions. That has certainly been the routinely-imposed sanction in matters in which an attorney has been convicted of a criminal sexual offense relating to children. Thus, for example, we disbarred an attorney who was convicted under federal law of sexual exploitation of a minor, *see In re Thompson*, 197 *N.J.* 464, 464, 963 *A.*2d 837 (2009), and we disbarred an attorney convicted of second-degree sexual assault on his three minor daughters, *see In re X*, 120 *N.J.* 459, 463–64, 577 *A.*2d 139 (1990) (evaluating long period of time during which assaults continued and seriousness of particular acts as bearing on quantum of punishment). In the same vein, we disbarred an

attorney following his federal felony conviction for possession of child pornography. *See In re Sosnowski,* 197 *N.J.* 23, 23–24, 961 *A.*2d 697 (2008).

Other criminal convictions arising from sexual offenses have also led us to impose the severe sanction of disbarment. We have, for example, found it appropriate to disbar an attorney convicted of aggravated sexual assault, *see In re Wright,* 152 *N.J.* 35, 35, 702 *A.*2d 830 (1997), an attorney convicted of multiple counts of aggravated criminal sexual contact, *see In re Palmer,* 147 *N.J.* 312, 313, 687 *A.*2d 724 (1997), and, in a very early case, an attorney convicted of carnal knowledge and carnal abuse, *see In re Wesler,* 1 *N.J.* 573, 573, 64 *A.*2d 880 (1949) (imposing discipline based on Court's decision affirming conviction and referring to *State v. Wesler,* 137 *N.J.L.* 311, 59 *A.*2d 834 (Sup.Ct.1948)).

But even a conviction for a sexual offense has not always resulted in an attorney's disbarment. For example, in a matter involving an attorney who admitted, as part of a guilty plea to second-degree sexual assault, *see N.J.S.A.* 2C:14–2 b, that he had "purposely touched the buttocks of a ten-year-old boy who was visiting [his] son," we concluded that a three-year period of suspension was the appropriate discipline. *In re Herman,* 108 *N.J.* 66, 67, 71, 527 *A.*2d 868 (1987). In reaching that conclusion, we agreed with the DRB that although the crime did not directly involve respondent's practice of law, it adversely reflected on his fitness to practice, *id.* at 69–70, 527 *A.*2d 868 (quoting from DRB recommendation), and we concluded that it also violated his duty to adhere to the high standards of conduct expected of members of our profession, *id.* at 70, 527 *A.*2d 868. Of particular note, we recognized, as a relevant consideration, the impact that respondent's conduct had on the victim. *Id.* at 69–70, 527 *A.*2d 868. As reported by the DRB, "[t]his was a serious crime of moral turpitude involving a child of tender years. The young victim required weeks of counseling, but a traumatic event such as this will long leave its scar on the victim." *Id.* at 69, 527 *A.*2d 868. In mitigation, we noted that respondent had an unblemished disci-

plinary history, had cooperated with the police, and had ceased practicing, effectively accepting a voluntary suspension, almost immediately after his arrest. *Id.* at 69–70, 527 *A.*2d 868. We therefore imposed a three-year suspension, retroactive to the date when the voluntary suspension had begun. *Id.* at 70, 527 *A.*2d 868.

We have, in the past, imposed shorter periods of suspension as the sanction for other types of sexual criminal convictions. *See, e.g., In re Peck,* 177 *N.J.* 249, 249, 827 *A.*2d 1039 (2003) (imposing one-year suspension following federal conviction for sexual exploitation of a minor); *In re Rosanelli,* 176 *N.J.* 275, 275, 822 *A.*2d 606 (2003) (imposing six-month suspension following guilty plea to fourth-degree endangering welfare of child); *In re McBroom,* 158 *N.J.* 258, 258–59, 729 *A.*2d 429 (1999) (imposing two-year suspension following federal conviction for possession of child pornography); *In re Pierce,* 139 *N.J.* 433, 433, 655 *A.*2d 438 (1995) (imposing reprimand following conviction for lewdness); *In re Ruddy,* 130 *N.J.* 85, 86, 612 *A.*2d 949 (1992) (imposing two-year suspension following guilty plea to endangering welfare of child); *In re Addonizio,* 95 *N.J.* 121, 125, 469 *A.*2d 492 (1984) (imposing three-month suspension for conviction of fourth-degree criminal sexual contact and concluding that behavior was "aberrational and not the product of a diseased mind").

Although we have cautioned that sexual offenses involving clients will be treated severely, *see In re Gallo,* 178 *N.J.* 115, 123, 835 *A.*2d 682 (2003), there are few published decisions addressing such matters, and those decisions also yield a variety of disciplinary outcomes. In *Gallo, supra,* for example, we expressed concern that an attorney, who entered a guilty plea to four separate fourth-degree crimes of criminal sexual contact with three clients and an adversary pro se litigant, should have had the quantum of discipline evaluated based on the full factual record rather than the few facts sufficient to support his guilty plea. *Id.* at 120–21, 835 *A.*2d 682. Therefore, although the attorney admitted that he had "placed his hands on the breasts of his clients, D.W. and D.I.,

without their consent; that he placed the hand of his client, D.B., on his groin without her consent; and that he placed the hand of the pro se litigant, T.T., on his groin without her consent," we concluded that the DRB should not have relied on that limited record. *Id.* at 119, 835 *A.*2d 682. We directed the DRB instead to look beyond the minimal factual circumstances that the attorney was required to admit on the record in order to have his plea deal accepted. *Id.* at 124, 835 *A.*2d 682. We concluded that we could not be confident that the DRB's proposed retroactive three-year suspension was appropriate in light of the limited record and we remanded for further proceedings. *Ibid.* Mr. Gallo subsequently consented to disbarment. *See In re Gallo,* 181 *N.J.* 304, 304, 856 *A.*2d 30 (2004).

Although we expressed great concern about the fact that Gallo's offenses were committed against clients, that concern arose, at least in part, from the magnitude and severity of the acts that led to the underlying criminal complaints. That is, the complaints against Gallo involved four separate victims, each of whom was physically assaulted either at his law firm office or at a courthouse. *See Gallo, supra,* 178 *N.J.* at 120, 835 *A.*2d 682. Three of the women were clients, and the fourth was a pro se litigant who alleged that Gallo assaulted her in the courthouse where she was seeking a restraining order against his client. *Ibid.* Those facts were sufficiently severe and extensive that we were not inclined to permit respondent to limit his disciplinary exposure through a bare-bones plea allocution. *Id.* at 123–24, 835 *A.*2d 682.

Nevertheless, merely because the inappropriate sexual behavior is directed at a client, or directed at someone who is indigent, discipline has not always been enhanced. As an example, in an early case involving an attorney's blatantly inappropriate sexual activities directed toward an indigent client, this Court imposed a rather modest penalty. *See In re Liebowitz,* 104 *N.J.* 175, 175–76, 516 *A.*2d 246 (1985).

In the *Liebowitz* matter, the attorney was assigned to serve as pro bono counsel for an indigent matrimonial client involved in a

custody dispute and invited her to join him at a restaurant for what he described as a meeting with attorneys and clients. *Id.* at 176–77, 516 *A.*2d 246. Thereafter, he offered her a ride home, but drove her, with her acquiescence, to his home instead. *Id.* at 177, 516 *A.*2d 246. The client believed that they would be discussing her case, but Liebowitz said later that because he had assigned her matter to one of his associates, he saw the evening as purely a social encounter. *Ibid.* After Liebowitz and the client arrived at the apartment, he made sexual advances toward her. Those advances included inviting her into his bedroom to sit on his bed, asking her to engage in sexual activity, "unbutton[ing] the top front of her dress" in spite of her verbal and physical efforts to stop him, forcibly kissing her, removing his clothing and pulling her onto the bed, and "touch[ing] her intimate parts and plac[ing] her hand on his genital area to assist his sexual self gratification." *Ibid.* Liebowitz was charged with the criminal offense of lewdness, but was acquitted because of the State's failure to prove beyond a reasonable doubt that the client had not consented. *Id.* at 178, 516 *A.*2d 246.

In the disciplinary proceeding that followed, a Special Ethics Master found that the attorney had engaged in sexual contact and that, in light of the vulnerability of the client, then fighting for custody of her children, "she cannot be said to have truly consented to [Respondent's] sexual advances. That such inherent coercion was present is clear from the evidence, including her resistance to such advances." *Id.* at 178–79, 516 *A.*2d 246. The DRB rejected respondent's contention that he was not acting as the victim's attorney when the interactions took place, and found that the indigent client "could reasonably infer that a failure to accede to Respondent's desires would adversely impact on her legal representation." *Id.* at 180, 516 *A.*2d 246. Even so, the DRB recommended that Liebowitz be reprimanded, taking into consideration his long and unblemished career, the aberrational nature of the event, the proof of his good character, his full recognition of the seriousness of the misconduct and the fact that he "has

discontinued his practice of socializing with clients." *Id.* at 181, 516 *A.*2d 246.

Although this Court adopted that recommendation without comment, *see id.* at 176, 516 *A.*2d 246, in our subsequent decisions we have charted a different course. For example, we have adopted a harsher view when imposing discipline on attorneys who have been convicted of acts of domestic violence. That approach reflects the fact that domestic violence involves victims who are particularly vulnerable, and is in keeping with the expression of public policy evidenced in our strict domestic violence laws. *See, e.g., In re Principato, supra,* 139 *N.J.* 456, 463, 655 *A.*2d 920 (1995) (announcing rule that suspension will ordinarily be imposed for acts of domestic violence); *In re Magid, supra,* 139 *N.J.* 449, 455, 655 *A.*2d 916 (1995) (same). Even in announcing that such a conviction would ordinarily result in suspension, we gave the new rule prospective application. *Principato,* 139 *N.J.* at 463, 655 *A.*2d 920; *Magid,* 139 *N.J.* at 455, 655 *A.*2d 916; *see In re Margrabia,* 150 *N.J.* 198, 200–01, 695 *A.*2d 1378 (1997) (imposing suspension of three months on attorney found to have committed predicate offense of simple assault on his wife in domestic violence proceeding). *But see In re Toronto,* 150 *N.J.* 191, 197, 696 *A.*2d 8 (1997) (imposing three-month suspension for conviction of simple assault on spouse committed prior to announcement of new rule based on aggravating factors). As a result, in both *Principato* and in *Magid,* we imposed only a reprimand, in spite of the fact that the victim in *Principato* was originally referred to the attorney by a battered women's shelter and continued to be his client during the incident leading to his conviction for assaulting her. *Principato, supra,* 139 *N.J.* at 459–60, 655 *A.*2d 920.

As these precedents demonstrate, we have rarely established bright line rules that will govern disciplinary infractions, including serious matters involving criminal offenses. The most notable exception, of course, is our unfaltering view about the severity of the punishment to be meted out to attorneys who engage in knowing misappropriation. *See In re Wilson,* 81 *N.J.* 451, 453,

409 *A*.2d 1153 (1979). Save for that clear directive, all discipline is highly fact-sensitive. To be sure, crimes involving theft, because of their relationship to the principles that lie behind the *Wilson* rule and their threat to the trust that must be reposed in attorneys, usually lead to disbarment. *See In re Imbriani,* 149 *N.J.* 521, 534, 694 *A.2d* 1030 (1997) (disbarring former judge for misappropriation of funds belonging to business venture). But even when the attorney has been convicted of a theft, and even if it involved a particularly vulnerable victim, disbarment has not been inevitable. *See In re Infinito,* 94 *N.J.* 50, 51–52, 462 *A.2d* 160 (1983) (imposing three-year suspension for conviction of larceny committed on "mentally retarded" members of household).

There are some crimes, of course, that are so serious that they plainly call out for the severe sanction of disbarment, whether directly related to the practice of law or not. This has been particularly true of such violent crimes as murder or manslaughter. *See, e.g., In re Johnson,* 157 *N.J.* 531, 531–32, 724 *A.2d* 796 (1999) (disbarring attorney convicted of first-degree murder); *In re Rasheed,* 134 *N.J.* 532, 532, 636 *A.2d* 67 (1994) (same; aggravated manslaughter, aggravated assault and terroristic threats); *In re McAlesher,* 93 *N.J.* 486, 487–88, 461 *A.2d* 1122 (1983) (same; second-degree murder). It also has generally been true that convictions relating to distribution or sale of dangerous drugs have resulted in disbarment. *See In re Valentin,* 147 *N.J.* 499, 500, 688 *A.2d* 602 (1997) (conviction for sale of pound of cocaine); *In re McCann,* 110 *N.J.* 496, 497–98, 541 *A.2d* 1361 (1988) (federal kingpin conviction); *In re Goldberg,* 105 *N.J.* 278, 283–84, 520 *A.2d* 1147 (1987) (federal conviction of conspiracy to distribute narcotics). Even so, we were far less harsh when disciplining an attorney who, although convicted of possession with intent to distribute, was principally an abuser of drugs. *See In re Kinnear,* 105 *N.J.* 391, 392–93, 522 *A.2d* 414 (1987) (imposing one-year suspension).

We have not adopted a bright line disbarment rule even in the context of crimes involving violence, *see, e.g., In re Viggiano,* 153

*N.J.* 40, 41, 707 *A.*2d 147 (1998) (imposing three-month suspension for conviction on two counts of simple assault); *In re Howard,* 143 *N.J.* 526, 533, 673 *A.*2d 800 (1996) (imposing three-month suspension for death by auto); *In re Predham,* 132 *N.J.* 276, 276–77, 624 *A.*2d 1371 (1993) (imposing six-month suspension for making terroristic threats, aggravated assault with deadly weapon, and possession of weapon for unlawful purposes); *In re Braun,* 118 *N.J.* 452, 453, 572 *A.*2d 590 (1990) (conviction of recklessly endangering another; three-month retroactive suspension); *In re Litwin,* 104 *N.J.* 362, 367–69, 517 *A.*2d 378 (1986) (imposing five-year suspension for aggravated arson; mental state at time of crime served as important mitigating factor), or for criminal offenses with a potential for violence, *see In re Wallace,* 153 *N.J.* 31, 32, 707 *A.*2d 143 (1998) (imposing three-month suspension for unlawful possession of handgun).

As we have often observed, the essential purpose of our system of attorney discipline is to protect the public, not to punish the attorney. *See In re Rigolosi,* 107 *N.J.* 192, 206, 526 *A.*2d 670 (1987) ("The purpose of a disciplinary proceeding, as distinguished from a criminal prosecution, is not so much to punish a wrongdoer as it is to protect the public from an untrustworthy lawyer."); *Wilson, supra,* 81 *N.J.* at 456, 409 *A.*2d 1153 (emphasizing that "the principal reason for discipline is to preserve the confidence of the public in the integrity and trustworthiness of lawyers in general"); *In re Makowski,* 73 *N.J.* 265, 271, 374 *A.*2d 458 (1977) ("The ultimate objectives of imposing a disciplinary measure are 'the protection of the public, the purification of the bar and the prevention of a re-occurrence.'" (quoting *In re Baron,* 25 *N.J.* 445, 449, 136 *A.*2d 873 (1957))).

Our system of discipline, as a result, includes few bright line rules, because few indeed are the acts for which one sanction will be invariably appropriate. Considering how best to protect the public from a particular attorney ordinarily involves considering the ethical lapses both in comparison to our relevant disciplinary precedents and in the context of that attorney's history rather

than merely identifying the attorney's specific unethical act. Our evaluation of the appropriate quantum of discipline, therefore, is necessarily fact sensitive.

## III.

 Respondent does not come to us with an unblemished record, as a result of which we begin our consideration of the disciplinary sanction that we will impose upon him with a brief recitation of his prior history of discipline. Respondent was admitted to the practice of law in New Jersey in 1994. His disciplinary history began in 2002 when he was admonished for failing to maintain a bona fide office for the practice of law, recordkeeping violations and the improper use of letterhead. In May 2003, in a matter that proceeded by default, he was reprimanded for failing to communicate with a client he represented in a tax appeal and for failing to cooperate with ethics authorities. *In re Witherspoon,* 176 *N.J.* 420, 823 *A.*2d 803 (2003). Later that same year, in October 2003, he was admonished for failing to communicate with another client in a tax appeal. In February 2008, he was censured for failure to communicate with his client in still another tax appeal. *In re Witherspoon,* 193 *N.J.* 489, 940 *A.*2d 297 (2008).

The acts that are the subject of the current grievances are different in kind from his earlier ethical improprieties, for they involve not the poor practices he used for keeping his clients informed about the progress of their matters, and not the equally poor manner in which he maintained his books and records, but a series of comments and communications with some of his bankruptcy clients of a sexual nature. Respondent concedes that the grievants would have testified that they understood him to be attempting to barter his services for various sexual favors, behavior that is plainly and unequivocally inappropriate.

The DRB recommends that respondent be suspended from the practice of law for a period of three months, based on his behaviors and his lengthy disciplinary history. Two dissenting

members concluded that a longer period, a suspension of six months, is needed, focusing in part on the number of incidents, the time period over which they occurred, and the fact that respondent's history demonstrates that lesser punishments have not deterred further unethical acts. Our dissenting colleagues would not only disbar respondent, but would create a new bright line rule of automatic disbarment of attorneys who engage in the behavior respondent has displayed. *See post* at 367, 369–70, 3 *A.*3d at 510–11, 511–12. We do not agree with any of these recommendations, but conclude that a one-year period of suspension is the appropriate quantum of discipline in this matter. We do so for several reasons.

First, we rely on the stipulated factual record, which exactly matched all of the factual assertions in the complaint and which is, therefore, unlike the limited and self-serving plea colloquy that we found was inadequate in *Gallo*. As offensive as respondent's behavior was, according to that stipulated record, none of the grievants accused respondent of forcing them to endure any unwanted physical contact or even attempting to do so; none of them felt sufficiently pressured that she even considered giving in; none sought therapy or treatment to overcome the experience; none has suggested the incidents were traumatic; and none pursued criminal charges. Although they filed grievances against him, there is no evidence that any of them found him threatening or dangerous. This record therefore lacks the severity of the unethical sexually-oriented behavior that we have previously considered to be worthy of disbarment.

Second, nothing in the record suggests that these women, or women filing for bankruptcy in general, are especially vulnerable or more in distress because of the nature of their legal matters than are other categories of clients. Most clients are under stress and feel vulnerable when consulting with counsel and there are many clients who are equally, if not more, vulnerable than people filing for bankruptcy. Compared to the clients in *Liebowitz*, *supra*, 104 *N.J.* at 176, 516 *A.*2d 246 (indigent client in child

custody dispute), and *Principato, supra,* 139 *N.J.* at 459, 655 *A.2d* 920 (battered woman seeking divorce and custody), and compared to the victims in *Gallo, supra,* 178 *N.J.* at 120, 835 *A.2d* 682 (adversary pro se litigant seeking restraining order against attorney's client), and *Infinito, supra,* 94 *N.J.* at 52, 462 *A.2d* 160 ("mentally retarded" household members), we see no principled ground on which to carve out women involved in bankruptcy proceedings as particularly vulnerable and as especially in need of protection.

■ Third, as we have previously cautioned, preying on clients will be dealt with more harshly than other acts because it goes directly to the heart of the trust on which the attorney-client relationship is founded. But we cannot endorse the dissenters' automatic disbarment approach because of its broader implications. Carried to its logical conclusion, creating the "zero tolerance" rule that they advocate based on this record would demand that we automatically disbar attorneys involved in non-criminal, non-threatening, non-traumatizing, purely verbal, sexual improprieties directed at other adults, simply because they are clients. In light of our disciplinary precedents making plain that not every conviction for a sexual offense will result in disbarment, we conclude that it would be disproportionate punishment indeed if respondent's behavior, although boorish, insensitive and offensive, but well shy of criminal, found itself on the far side of that bright line.

On balance, we fix the sanction in this case not only by looking at what this attorney did, but by evaluating that conduct, along with his prior history of disciplinary infractions, against the pre-existing decision-making matrix that guides all disciplinary matters. Viewed against our carefully considered precedents, the quantum of discipline recommended by the DRB is insufficient to address the series of behaviors exhibited over time by this attorney. His repeated, demeaning and offensive suggestions to his clients were not merely in jest, but were an effort to barter his professional services for sexual favors. It is behavior that de-

mands our stern condemnation and significant discipline. Nonetheless, we cannot impose, fairly, discipline on respondent far harsher than the sanctions our precedents demand.

We therefore impose upon respondent the suspension from the practice of law for a period of one year. In keeping with the precedents to which we have adverted, we conclude that neither a longer period is required nor a shorter period will suffice. We condition respondent's return to the practice of law on the successful completion of an approved course in sensitivity training and the institution of appropriate accounting controls.

Justice LaVECCHIA, dissenting.

In this disciplinary case, we deal with an attorney who attempted to barter his legal services in exchange for sex from his vulnerable female clients. Even the bloodless, stipulated record presented in this case cannot disguise the impact of the course of conduct undertaken by respondent, David J. Witherspoon. In an astounding exhibition of bad taste, lack of professionalism, and overreaching of vulnerable clients who were at the doors of bankruptcy, respondent instilled in three female clients and the daughter of another client, a belief that a fee owed would be forgiven or abated if each would engage in some form of sexually-oriented conduct with him. Adding insult to injury, a review of respondent's statements made under oath at the hearing in this matter reveals a man without remorse. That is, a man without any remorse except that he was caught and his conduct opened him up to the four grievances filed against him.

This matter comes before us on an order to show cause issued by this Court to review the findings and recommendation of the Disciplinary Review Board (DRB) that respondent be suspended for a period of three months. The Court now imposes a one-year suspension. Because I am unable to agree with the quantum of punishment to be imposed on respondent, whose outrageous behavior, I conclude, requires disbarment, I respectfully must dissent.

## I.

An ethics complaint, filed against respondent under Docket Nos. XIV–06–095E and VI–07–900E, XIV–06–096E and VI–07–901E, XIV–06–482E and VI–07–902E, XIV–06–483E and VI–07–903E, charged him with engaging in sexual harassment, sexual discrimination, recordkeeping violations, and practicing law while ineligible for failure to pay the New Jersey Lawyers' Fund for Client Protection annual assessment.[2] It is the first count of this complaint against respondent that is most remarkable. It set forth allegations by four different women who claimed that respondent sexually harassed and/or discriminated against them. All of the women victims (three clients and one a family member of a client) were vulnerable financially and were seeking bankruptcy protection. The District VI Ethics Committee (DEC) conducted a hearing on March 28, 2008, at which respondent testified. In lieu of court appearances by the women who filed grievances against him, the DEC accepted the following stipulations establishing the anticipated content of each woman's testimony.

(a) T.B. would testify that, on August 13, 2005, respondent was retained by L.B., Sr. (L.B., Sr.) to represent him in a bankruptcy matter. L.B., Sr. was assisted by his daughter, T.B., in discussing with respondent the fees required for handling L.B., Sr.'s bankruptcy. Respondent's retainer agreement required a legal fee of $700 from L.B., Sr. When T.B. advised respondent that L.B., Sr. was short $300 in legal fees, respondent offered to meet T.B. in a hotel room for three hours, to take care of the $300. T.B. understood respondent's comments to constitute a proposal to exchange sexual favors for the $300 balance owed by L.B., Sr. in legal fees. In

---

[2] In addition to the instant disciplinary charges, it should be noted that respondent had a troubling disciplinary history. Since his admission to the New Jersey bar in 1994, respondent has been disciplined on four previous occasions. In 2002, he was admonished for failing to maintain a bona fide office, for improper letterhead, and for recordkeeping violations. *In re Witherspoon*, No. 02–050 (DRB Mar. 18, 2002). A year later, on May 6, 2003, respondent received a reprimand for his failure to communicate with his client in a tax appeal and for failing to cooperate with ethics authorities. *In re Witherspoon*, 176 *N.J.* 420–21, 823 *A.*2d 803 (2003). Later that same year, he was admonished for failing to communicate with another tax appeal client. *In re Witherspoon*, No. 03–280 (DRB Oct. 24, 2003). In 2008, respondent was censured, yet again, for failing to communicate with a tax appeal client. *In re Witherspoon*, 193 *N.J.* 489, 940 *A.*2d 297.

or about January 2006, T.B. delivered documents to respondent's office on behalf of L.B., Sr. At that time, L.B., Sr. owed respondent a balance of $200 in legal fees, which T.B. told respondent she was unable to remit on L.B., Sr.'s behalf. Whereupon, respondent offered that T.B. could come to his office in a bathing suit and dance for him, to take care of the $200. T.B. understood respondent's comments to constitute a proposal to exchange sexual favors for the $200 balance owed by L.B., Sr. in legal fees;

(b) S.B. would testify that, in September 2005, S.B. retained respondent to represent her in a bankruptcy matter. On one occasion, when S.B. visited respondent's office in the presence of her female friend, respondent remarked that many gay women "come on" to respondent and that respondent would like to see S.B. and her friend "make out". At that time, respondent continued to state to S.B. that if he were permitted to watch them "make out," he would file the bankruptcy free of charge. S.B. understood respondent's comments to constitute a proposal to exchange sexual favors for the balance owed to respondent in legal fees. Thereafter, in a second incident, S.B. came to respondent's office to make a fee payment and to inform him of an additional bankruptcy creditor. At that time, respondent stated that he would only add the creditor to S.B.'s bankruptcy if she lifted her skirt, at which S.B. refused, and left respondent's office. S.B. understood respondent's comments to constitute a proposal to exchange sexual favors for representation in her bankruptcy matter. Thereafter, on another trip to respondent's office to make payment on the balance of legal fees owed to respondent, respondent stated that S.B. could satisfy her outstanding legal fees by either allowing him to watch her with her female friend or by allowing him to join in, to which S.B. refused. S.B. understood respondent's comments to constitute a proposal to exchange sexual favors for the balance owed to respondent in legal fees. Thereafter, S.B. retained new counsel to complete her bankruptcy matter;

(c) S.S. would testify that, on July 18, 2001, S.S. retained respondent to represent her in filing a bankruptcy matter. During the course of respondent's representation, he began to question S.S. about her personal life, ask if she would go out with him and made inappropriate sexual advances to S.S., but S.S. declined his proposals. S.S. understood respondent's comments to constitute a proposal to exchange sexual favors for representation in her bankruptcy matter. Thereafter, S.S. retained new counsel to complete her bankruptcy matter; and

(d) A.C. would testify that, in September 2005, A.C. retained respondent to represent her in a bankruptcy matter. At a subsequent appointment at respondent's law office, respondent stated to A.C., "Oh, so you're the gay girl". After confirming her personal sexual orientation, respondent continued to remark about A.C.'s sexuality, as well as suggest that A.C.'s lesbianism was caused by a bad experience with the male sex organ. A.C. understood respondent's comments to constitute a denigration of her lesbian lifestyle. Thereafter, after the conclusion of a bankruptcy hearing, respondent commented to A.C. that he was a "breast man," that she was looking good that day and that if she came back to his office and joined him on his "office couch," he would return to her $660 of the legal fees she previously paid, to which A.C. refused. A.C. understood respondent's comments to constitute a proposal to exchange sexual favors for legal fees paid to respondent.

In response to those allegations, respondent asserted that whatever comments he made were made in jest, and that the women were retaliating against him by filing grievances. What is most notable about respondent's testimony before the DEC is his total lack of comprehension of any wrongfulness in his conduct.[3] When asked repeatedly whether he thought that his comments and actions were wrong, respondent showed no remorse, but instead appeared motivated by a desire to avoid future disciplinary complaints against him. Indeed, when he was finally pressed to answer whether he would continue to conduct himself as he had in the past, respondent replied, "[W]ould I do things differently, heck yeah, because I left myself wide open." Moreover, respondent voiced his discomfort with the inquiry:

> The problem with the question and the answer, you know, if the Ethics Committee wants to write strict rules on what we can talk about and not talk about, fine, then put it out there but the Ethics Committee has too many rules that are generalities, appropriate behavior, appropriate conduct, whose definition? Your's [sic], mine, Catholic, Protestant, Muslim, you can't tell me what's appropriate and I can't tell you what's appropriate unless you want to say this is a moral ethics course and, I'm sorry, ... I can't—it's hard to get boxed in because you're talking about freedom of speech, you're talking about I can't discuss what we want, talking about free market. If clients are offended, get another attorney, maybe people in here don't like that answer but that's what's called free marketplace and if you want to be strict, then write strict rules, you know, you need stricter rules, your rules are too general.

Ultimately, the DEC rejected respondent's assertion that his overtures to the four females were intended in jest, finding the defense "entirely unpersuasive." The DEC found that respondent may have intended to trade his legal services for sexual favors, and that, regardless of his intent, the women clearly perceived his comments to be bartering offers. The DEC concluded that respondent violated *RPC* 1.7(a)(2), *RPC* 4.4(a), *RPC* 8.4(d), and *RPC* 8.4(g), and it recommended a censure.

---

[3] Inexplicably, respondent thought he might garner some sympathy from the DEC because he had represented S.S., who was a Muslim and dressed in traditional fashion "from head to toe," and how he had traveled with her to the bankruptcy hearing shortly after September 11, 2001, at a time when he perceived strong anti-Muslim sentiment "going on."

On a de novo review of the record, the DRB agreed that respondent engaged in unethical conduct. It found that, in respect of the four grievants, respondent "repeatedly made sexual propositions that they interpreted as offers of respondent's legal services in exchange for sex." The DRB found no support for respondent's claim that he was only joking, and gave "considerable weight to the clients' interpretations—that respondent was attempting to obtain sexual favors from them." Summarizing its findings as to the first count, the DRB described respondent as having "preyed on his female clients." Further, it neatly captured the gist of respondent's misconduct as follows:

> [T]he misconduct involved four separate women, at what was arguably one of the most vulnerable times in their lives—while under bankruptcy protection (the fourth woman was accompanying her father, a bankruptcy client, to respondent's office). His conduct was also spread out over a five-year time period, between 2001 and 2006 and, for some of the women, occurred on multiple occasions. Respondent offered discounted legal services, fee refunds—even free motion-practice—in hopes of receiving sexual favors.

For that, the DRB found a violation of *RPC* 1.7(a)(2) with respect to all four grievants.[4] Also, the DRB found that respondent violated *RPC* 8.4(g),[5] and it sustained the violation for practicing while ineligible entered by the DEC. With respect to the allegations that respondent violated *RPCs* 8.4(d) and 4.4, the DRB gave respondent the benefit of its doubt and dismissed those charges. A six-person majority of the DRB imposed a three-month suspension, while a two-person dissent viewed respondent's behavior more harshly, and called for a six-month suspension. The matter came before this Court on an order to show cause to review the DRB findings, and a majority of our Court now sees fit to increase respondent's suspension to one year.

---

[4] The DRB commented that respondent, "[h]aving placed his own prurient interests above those of his clients, ... created the possibility that he would not view their matters favorably if his advances were rejected."

[5] The DRB concluded that respondent sexually harassed all four women, some on more than one occasion, and discriminated against S.B. and A.C. based on their sexual orientation.

My difference with the DRB, and with the majority of my colleagues on the Court, arises from the discipline to be imposed on respondent for his behavior. In my view, line drawing over the length of suspension misses the point that respondent's behavior violated all expected and plainly held norms of professional behavior for an attorney at law.

## II.

Respondent's conduct is clearly and utterly inconsistent with any recognized norm of professionalism and threatens to draw our profession into disrepute. The only appropriate measure of discipline that protects the public from respondent's intolerable behavior, and sends a zero-tolerance message toward lawyers who would consider preying on their clients is disbarment.

Some thirty years ago, Chief Justice Wilentz observed that "the principal reason for discipline is to preserve the confidence of the public in the integrity and trustworthiness of lawyers in general." *In re Wilson*, 81 *N.J.* 451, 456, 409 *A.2d* 1153 (1979). Although Chief Justice Wilentz reemphasized this basic tenet in the context of charges stemming from misappropriation of client funds, his assessment is not restricted to that application. Because trust and integrity must pervade every level of the attorney-client relationship, I believe that it is antiquated to afford greater protections to a client's financial interests than to his or her gender or sexual identity. One's bodily integrity is at least as important as the security of the finances one entrusts to an attorney. In light of the overwhelming condemnation we, as a society, share for the type of behavior in which respondent engaged, his own inability to recognize the wrongfulness of his conduct reveals a man who is woefully out of touch, and certainly incapable of exercising the fitness of character required of an attorney at law.

Although the majority recites numerous previous disciplinary decisions of this Court, the cited precedent is readily distinguished from the rather unique issue in this case. Most of the cited cases

involved the imposition of discipline as a collateral consequence of a criminal conviction that did not implicate the attorney-client relationship. *See, e.g., In re Thompson,* 197 *N.J.* 464, 963 *A.*2d 837 (2009) (ordering disbarment as collateral consequence of federal conviction for sexual exploitation of a minor).[6] Only one case cited by our colleagues is remotely analogous to the instant proceeding, and even that case arose in the context of a criminal conviction for four counts of fourth-degree criminal sexual contact: *In re Gallo,* 178 *N.J.* 115, 835 *A.*2d 682 (2003); *see also* 181 *N.J.* 304, 856 *A.*2d 30 (2004) (memorializing subsequent voluntary disbarment). Like Witherspoon, Gallo faced allegations of sexual misconduct from four separate women, three of whom were clients. 178 *N.J.* at 118, 835 *A.*2d 682. Unlike the present case, however, the issue in *Gallo* did not focus on the quantum of discipline to be imposed, but rather on the need to develop a record beyond the guilty plea entered by Gallo. The case was remanded so that the Office of Attorney Ethics could develop a thorough record in order to make a proper determination of the appropriate quantum of discipline.[7] *Id.* at 119–22, 835 *A.*2d 682.

---

[6] Although criminal convictions for such sexual offenses certainly give rise to serious concerns about an attorney's fitness to practice, such collateral occurrences are not "the principle reason" we exercise discipline over attorneys. *See Wilson, supra,* 81 *N.J.* at 456, 409 *A.*2d 1153. Rather, our function is to protect and maintain public confidence in the bar, and in the dignity of our profession. *See ibid.*

[7] That holding is central to understanding the *Gallo* decision. Yet, although relying on *Gallo,* the majority today indicates a willingness to accept the brief and targeted stipulated statements from the victims. Resting only on those statements, the majority assumes that "none of [the grievants] felt sufficiently pressured that she even considered giving in; none sought therapy or treatment to overcome the experience; none has suggested the incidents were traumatic; and none pursued criminal charges." *Ante* at 360, 3 *A.*3d at 506.

The record is silent as to all those facts, and does not provide even a modicum of support for any of those conclusions. What is clear is the extraordinary fact that four different women were so appalled and disturbed by respondent's conduct that they each filed a disciplinary complaint against him.

The majority is also content to conclude, on the barren record presented, that "nothing ... suggests that these women, or women filing for bankruptcy in

We imposed an indefinite suspension on Gallo pending the results of that hearing, *id.* at 125, 835 *A.*2d 682, although Gallo thereafter consented to voluntary disbarment, 181 *N.J.* 304, 856 *A.*2d 30.

Of all the precedent discussed by the majority, *Gallo* is most noteworthy. It clearly rejected, in unmistakable terms, the antediluvian disciplinary paradigm that previously might have tolerated or excused sexual misdeeds perpetrated by attorneys against clients: [8]

> We have traveled a far way from tolerance of sexual misconduct in the workplace and in our profession. We recognize the psychological damage that can be inflicted on the victims of sexual abuse, who silently suffer and do not complain because they feel powerless to do so. The sexual abuse of a client is unacceptable in any profession and in any business setting, and cannot be tolerated in our profession, which holds as sacred the dignity of the individual.
>
> [*Gallo, supra,* 178 *N.J.* at 123, 835 *A.*2d 682.] [9]

In fact, announcing strong deviations from previously tolerated behavior in our profession is not exceptional for our Court. In executing our oversight of the legal profession in New Jersey, this Court has been compelled, from time to time, to examine and recalibrate the disciplinary measures meted against attorneys who have breached our strict ethical standards. *See Wilson, supra,* 81 *N.J.* at 459–61, 409 *A.*2d 1153. I would impose the highest level of

---

general, are especially vulnerable or more in distress because of the nature of their legal matters than are other categories of clients." *Ante* at 360, 3 *A.*3d at 506. I must respectfully disagree with that analysis because it ignores the fact that respondent targeted his advances precisely at his clients' vulnerability: he offered to forgive, in exchange for sexual favors, the debts owed him for legal work by women in bankruptcy who were obviously experiencing financial difficulty.

[8] Notably *Gallo* did not refer at all to *In re Liebowitz,* 104 *N.J.* 175, 516 *A.*2d 246 (1985), another case cited by the majority herein, where the punishment imposed was radically different than what modern sensibilities reasonably would expect.

[9] For completeness, we note that *Gallo* was decided in 2003. Although one of the grievants in the instant matter fell victim to respondent's sexual misconduct in 2001, the remaining three did not experience it until 2005. Thus, respondent had the benefit of our opinion in *Gallo,* and should have conformed his behavior accordingly.

discipline on respondent. I wholeheartedly reject his effort to mitigate his behavior through the suggestion that he was merely "joking around"; it is not respondent's perspective that matters, but rather the perspectives of his clients, who sincerely believed that he was attempting to barter sex for legal services. When respondent's clients sought his assistance in financial matters, rather than providing support and expertise, he instead exploited their vulnerability and violated their trust.

## III.

Although the majority characterizes the result I reach as "a new bright line rule of automatic disbarment," *ante* at 360, 3 *A.*3d at 505, that description denies the fact-based approach that leads me to conclude that disbarment is the appropriate discipline for respondent's conduct toward clients in the context of the sanctity of lawyer-client interactions. Furthermore, my conclusion that respondent must be disbarred is supported by his troubling disciplinary history, and that history serves to underscore my resolve in the quantum of discipline he should face. Respondent has obviously failed to internalize the lessons to be learned from his past disciplinary experiences. In light of the seriousness of the current charges, respondent's inexplicable lack of remorse, and his grim disciplinary history, I would disbar respondent.

Any new attorney, fresh from the law school study of ethics and professional responsibility, will wonder how any penalty short of disbarment would be appropriate discipline for respondent's behavior. To borrow once again from Chief Justice Wilentz, "[a]s far as [I am] concerned, the only reason that disbarment might be necessary is that any other result risks something even more important, the continued confidence of the public in the integrity of the bar and the judiciary." *Wilson, supra,* 81 *N.J.* at 460, 409 *A.*2d 1153.

For these reasons, I would disbar respondent. I therefore respectfully dissent.

*For Suspension 1 year*—Chief Justice RABNER and Justices LONG, WALLACE, RIVERA–SOTO and HOENS—5.

*For Disbarment*—Justices LaVECCHIA and ALBIN—2.

*Opposed*—None.

## ORDER

The Disciplinary Review Board having filed with the Court its decision in DRB 08–302, concluding that **DAVID J. WITHER-SPOON** of **NEWARK**, who was admitted to the bar of this State in 1994, should be disciplined, and respondent having been ordered to show cause why he should not be disbarred or otherwise disciplined, and good cause appearing;

It is ORDERED that **DAVID J. WITHERSPOON** is suspended from the practice of law for a period of one year and until the further Order of the Court, effective August 24, 2010; and it is further

ORDERED that **DAVID J. WITHERSPOON** enroll in and successfully complete a course in sensitivity training approved by the Office of Attorney Ethics, which training shall be completed prior to the filing of a petition for reinstatement to practice; and it is further

ORDERED that respondent demonstrate to the satisfaction of the Office of Attorney Ethics that he has put appropriate accounting controls in place in his practice and that he is in compliance with the recordkeeping requirements of *Rule* 1:21–6; and it is further

ORDERED that respondent comply with *Rule* 1:20–20 dealing with suspended attorneys; and it is further

ORDERED that pursuant to *Rule* 1:20–20(c), respondent's failure to comply with the Affidavit of Compliance requirement of *Rule* 1:20–20(b)(15) may (1) preclude the Disciplinary Review Board from considering respondent's petition for reinstatement for a period of up to six months from the date respondent files

proof of compliance; (2) be found to constitute a violation of *RPC* 8.1(b) and *RPC* 8.4(c); and (3) provide a basis for an action for contempt pursuant to *Rule* 1:10–2; and it is further

ORDERED that the entire record of this matter be made a permanent part of respondent's file as an attorney at law of this State; and it is further

ORDERED that respondent reimburse the Disciplinary Oversight Committee for appropriate administrative costs and actual expenses incurred in the prosecution of this matter, as provided in *Rule* 1:20–17.